Jonathan MILLER, Secretary of the Finance and Administration Cabinet of the Commonwealth of Kentucky; Commonwealth of Kentucky, Department of Revenue, Appellants/Cross–Appellees,

v.

JOHNSON CONTROLS, INC.; Security Group, Inc. and Subsidiaries, Including Sargent & Greenleaf, Inc.; Willis North America, Inc. and Affiliates; Bunzl USA, Inc. and Subsidiaries Including Mak–Pak, Inc.; Tredegar Corporation, Inc. and Subsidiaries; Cosmos Broadcasting Corporation and Affiliates, Appellees/Cross–Appellants.

Nos. 2006–SC–000416–DG,
2007–SC–000819–DG.

Supreme Court of Kentucky.

Aug. 27, 2009.

Rehearing Denied Nov. 25, 2009.

C. Christopher Trower, Atlanta, GA, Laura Marie Ferguson, Department of Revenue, Office of Legal Services, Frankfort, KY, Counsel for Appellants/Cross–Appellees.

Bruce F. Clark, Erica Lynn Horn, Margaret R. Grant, Roger Benjamin Crittenden, Stites & Harbison, PLLC, Frankfort, KY, Paul H. Frankel, Morrison & Foerster, LLP, New York, NY, Counsel for Appellees/Cross–Appellants.

Thomas J. Luber, Mitzi Denise Wyrick, Wyatt Tarrant and Combs, LLP, Louisville, KY, Counsel for Amicus Curiae, Gannett Satellite Information Network, Inc.; Courier Journal and Louisville Times Co.; Gannett Direct Marketing Services, Inc.; Gannett River States Publishing Corp.; Courier Cellular Corporation; Computer Emporium; Courier Broadway Corp.

Opinion of the Court by Justice NOBLE.

This appeal addresses the constitutionality and application of certain amendments to the corporate tax statutes passed by the General Assembly in 2000 that barred the filing of combined tax returns under the unitary business concept and the issuance of tax refunds related to such a filing, even if by amended return, for the years prior to 1995. The Appellants (and Cross–Appellees) Jonathan Miller, et al., collectively on behalf of the Commonwealth of Kentucky, assert that the amended tax statutes satisfy all constitutional requirements, and that they were economic legislation enacted for a legitimate purpose, even though they disallow filing combined returns or collecting a refund thereon for the years before 1995. The Appellants also argue that the legislature effectively withdrew its consent to be sued for such refunds. Appellees (and Cross–Appellants) Johnson Controls, et al., argue that their due process rights will be violated if the 2000 amendments to the tax statutes are allowed to prevent them from getting a refund. They also claim denial of equal protection under the law and violation of other Kentucky Constitutional rights. Because we find that the tax statute amendments were enacted for the legitimate governmental purpose of regulating revenue, and that the amendments are rationally related to that purpose, there is no due process or other constitutional violation.

## I. Background

### A. Factual Background

Beginning in 1988, the Kentucky Revenue Cabinet began interpreting KRS 141.120 to disallow the filing of a combined tax return under the unitary business con-

cept. In Revenue Policy (RP) 41P225, the Cabinet determined to literally apply the language in KRS 141.120 which stated that such returns were disallowed. Prior to this, for sixteen years, the Cabinet had allowed qualified businesses to choose whether to file separate returns or a combined return under the unitary business concept. RP 41P225 made it clear that only separate returns would be allowed despite the fact that a group of corporations might function under a unitary business plan.

Many corporate enterprises function as clusters or chains of related corporations, often across many state lines. Determining how to apportion corporate income to allow for taxation in each state can be extremely difficult and can lend itself to tax "dodges" or fraud. One method to arrive at proper taxation for a specific part of a business chain is to simply tax each part separately. Another method, known as a combined return under a unitary business plan, lets the corporate entity file as a whole, then apportions the state tax according to some formula. There are pros and cons to both methods which are not germane here.

The Appellees originally filed separate tax returns. In 1994, this Court decided *GTE v. Revenue Cabinet, Commonwealth of Kentucky*, 889 S.W.2d 788 (Ky.1994), which held that related corporations (such as a parent and subsidiary) could file a combined tax return under the unitary business concept. After *GTE* was decided, the Appellees in this case sought to amend their returns by substituting combined returns under the unitary business concept as allowed in *GTE*, because they would owe less tax under such an approach and

could therefore claim a refund of taxes they claim to have overpaid.

Recognizing that applying *GTE* would result in a significant and unanticipated revenue loss, the General Assembly repeatedly amended the relevant statutes to bar the type of combined returns under the unitary business plan that the Appellees amended to file, and to bar the payment of any tax refunds that would be due to persons filing this type of amended return. The Appellees claim these statutory amendments have denied them due process of law and violated equal protection.

## B. Procedural and Legislative History of KRS 141.120 and KRS 141.200

Two statutes actually lie at the heart of this controversy: KRS 141.120 and KRS 141.200. Because they have been subject to significant amendment and shifting interpretations, some recounting of that history will be helpful in understanding this case.

### 1. Before 1996

*GTE* read the version of KRS 141.120 in effect at that time to "authorize multiple corporations engaged in a unitary business to file combined income tax returns." *GTE*, 889 S.W.2d at 791. As noted above, this meant that related corporations (e.g., a parent and subsidiary) could effectively file a single tax return. The Court so held despite the fact that KRS 141.200(1) at the time required that "[c]orporations that are affiliated must each make a separate return." The Court read "corporation" as used in KRS 141.200 to mean both individual corporations and groups of corporations that operated as a "unitary business." *GTE*, 889 S.W.2d at 793.[1] This meant that

---

1. Specifically, the Court stated:
    Although we recognize the argument by the Revenue Cabinet that KRS 141.200(1) requires separate corporate filings, we do not agree with the interpretation placed on the last sentence of that statute. "Corpora-

    tions" is defined by KRS 141.010(24) as having a meaning consistent with the definition of the word in § 7701(a)3 of the Federal Internal Revenue Code. 26 U.S.C. 7701. The concept of apportionment among states obviously has no place within

GTE and its subsidiaries would be treated as a single business under the "unitary business concept" and they could therefore file a combined return.

## 2. The 1996 Amendments

The General Assembly amended KRS 141.120 substantially in 1996, directly in response to the Court's decision in *GTE*, with the change having retrospective effect to any tax year ending on or after December 31, 1995. *See* 1996 Ky. Acts ch. 239, §§ 1, 3. A section was added that read, "Nothing in this section shall be construed as allowing or requiring the filing of a combined return under the unitary business concept or a consolidated return." KRS 141.120(11).

KRS 141.200 was amended in its entirety, with its changes having retrospective effect to any tax year ending on or after December 31, 1995. *See* 1996 Ky. Acts ch. 239, §§ 2, 3. The "[c]orporations that are affiliated must each make a separate return" language was removed. In its place, the General Assembly included definitions of "affiliated group" and "consolidated returns," both of which referenced the federal Internal Revenue Code. The General Assembly also included language allowing "affiliated groups" to file "consolidated returns."

The effect of this legislation was to undo the "unitary business concept" injected into the law by *GTE* while allowing parent-subsidiary groups of corporations, like those involved in the *GTE* litigation, to file what amounted to a single return going forward from 1995. In other words, the

General Assembly technically undid *GTE*, at least going forward, but implemented a substantially similar scheme under the "affiliated group" approach. This allowed the General Assembly to follow the national trend that *GTE* had recognized while giving it more control over the process than the judiciary.

## 3. The 1998 Budget Bill

Sometime in 1996 to 1998, the Revenue Cabinet realized that *GTE*'s interpretation of KRS 141.120 was creating substantial tax refund liabilities for the state for the years prior to 1995. The General Assembly was not apprised of, or at least was not able to address, these problems until late in the 1998 Regular Session, when it was well into the budgeting process. Because legislative sessions were only held every other year then, the first chance to deal with the problem with direct legislation would come two years later. To at least temporarily patch the problem, the General Assembly inserted a provision in the 1998 Budget Bill barring the state treasury from paying out any refunds sought pursuant to the theory announced in *GTE*. The Budget Bill would only be in effect for two years, meaning the problem would have to be addressed fully in 2000.

## 4. The 2000 Amendments

In 2000, the General Assembly finally had a chance to deal directly with the emerging problem created by those corporations trying to file amended returns for years before 1995 to take advantage of

---

the confines of the Federal tax plan. Our interpretation of the word "Corporation" as used in KRS 141.200(1) is, however, consistent with the Federal definition. We interpret the last phrase of § 1, which is "corporations that are affiliated" to refer to unitary corporations such as GTE and Subsidiaries. The statute merely requires that each unitary corporation file a separate

corporate income tax return. It does not mean that each component corporation of the unitary group must file separately. The taxation statutes differentiate between simple corporations and unitary corporations. This statute simply requires a return for both classes of corporate taxpayers.
*GTE*, 889 S.W.2d at 792–93.

*GTE*'s interpretation of the version of KRS 141.120 in effect in those years.

It amended KRS 141.120 to remove the express bar on filings under the "unitary business concept" found in the 1996 version at KRS 141.120(11). *See* 2000 Ky. Act. ch. 543, § 2. This was not a rollback of the disapproval of the "unitary business concept," however.

Instead, the General Assembly again amended KRS 141.200 substantially to address the problem. *See* 2000 Ky. Act. ch. 543, § 1. The amendment added the following language:

(7) For any taxable year ending on or after December 31, 1995, except as provided under subsection (3) of this section, nothing in this chapter shall be construed as allowing or requiring the filing of:

(a) A combined return under the unitary business concept; or

(b) A consolidated return.

(8) No assessment of additional tax due for any taxable year ending on or before December 31, 1995, made after December 22, 1994, and based on requiring a change from any initially filed separate return or returns to a combined return under the unitary business concept or to a consolidated return, shall be effective or recognized for any purpose.

(9) No claim for refund or credit of a tax overpayment for any taxable year ending on or before December, 31, 1995, made by an amended return or any other method after December 22, 1994, and based on a change from any initially filed separate return or returns to a combined return under the unitary business concept or to a consolidated return, shall be effective or recognized for any purpose.

(10) No corporation or group of corporations shall be allowed to file a combined return under the unitary business concept or a consolidated return for any taxable year ending before December 31, 1995, unless on or before December 22, 1994, the corporation or group of corporations filed an initial or amended return under the unitary business concept or consolidated return for a taxable year ending before December 22, 1994.

(11) This section shall not be construed to limit or otherwise impair the cabinet's authority under KRS 141.205.

KRS 141.200. The bill also had language stating that subsection (7) "shall apply retroactively for taxable years ending on or after December 31, 1995," and that subsections (8) to (11) "shall apply retroactively for all taxable years ending before December 31, 1995." 2000 Ky. Acts ch. 543, § 3.

The effect of this amendment was to maintain the bar on combined returns under the "unitary business concept" and to retrospectively apply that bar to years before 1995. Because there was no alternative for filing "consolidated returns" for "affiliated groups" in those years, as had been allowed beginning in 1995 under the 1996 amendments, this new amendment purported to undo any effect *GTE* might have had prior to 1995.

## 5. Subsequent Amendments

Subsequent amendments of KRS 141.120 and .200 left the 1996 and 2000 amendments substantially intact. Also, KRS 141.200 has been amended to include provisions related to "affiliated groups" and "consolidated returns" for the tax years 2004 to 2007. This has had the effect of moving KRS 141.200(7)—(11), as found in the 2000 version of the statute, to KRS 141.200(15)—(19). For present purposes, however, the law appears to be substantially the same as it appeared in 2000.

## II.  Analysis

### A.  Sovereign Immunity

■■  Appellants argued that Appellees cannot obtain a tax refund in this action from Revenue because the legislature withdrew its consent, specifically, to be sued for a refund under a combined return based on the unitary business plan in KRS 141.200(17).  Certainly, that is the plain meaning of that section.  However,

The constitutional privilege of a State to assert its sovereign immunity in its own courts does not confer upon the state a concomitant right to disregard the Constitution or valid federal law. The States and their officers are bound by obligations imposed by the Constitution and by federal statutes that comport with the constitutional design....

Sovereign immunity does not bar all judicial review of state compliance with the Constitution and valid federal law.

*Alden v. Maine*, 527 U.S. 706, 755–56, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999).

The Appellees have raised a federal due process challenge to the 2000 amendments. As such, their federal constitutional claims must be considered under the Supremacy Clause.  If there is a federal constitutional violation, that law prevails.

### B.  Due Process

■  The term "due process" has two meanings in American jurisprudence:  (1) substantive due process, which is based on the idea that some rights are so fundamental that the government must have an exceedingly important reason to regulate them, if at all, such as the right to free speech or to vote; and (2) procedural due process, which requires the government to follow known and established procedures, and not to act arbitrarily or unfairly in regulating life, liberty or property.  Since the Appellees have paid taxes and are seeking a refund by amending their separate returns to a combined return under the unitary business concept for the years in question, they claim a property interest will be taken without due process of law if the amended tax statutes are allowed retroactive application to bar their claims.

It has been established that "a taxpayer has no vested right in the Internal Revenue Code." *United States v. Carlton*, 512 U.S. 26, 33, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994).  (Nor, by comparison, is there a vested right in the Kentucky Revenue Code.)  By this statement, written by Justice Blackmun, the United States Supreme Court held that there is no substantive due process right which prevents retroactive tax law applications.  The Supreme Court explained:

"Taxation is neither a penalty imposed on the taxpayer nor a liability which he assumes by contract.  It is but a way of apportioning the cost of government among those who in some measure are privileged to enjoy its benefits and must bear its burdens.  Since no citizen enjoys immunity from that burden, its retroactive imposition does not necessarily infringe on due process...."

*Id.* (quoting *Welch v. Henry*, 305 U.S. 134, 146–47, 59 S.Ct. 121, 83 L.Ed. 87 (1938)) (omission in original).

Having determined that matters involving taxation do not involve a fundamental right (and thus did not implicate substantive due process), the Supreme Court also undertook to determine whether retroactive application of a tax statute, without notice and causing loss to the taxpayer, would violate procedural due process.  After a painstaking analysis, the Supreme Court determined that as long as the statutory amendment was rationally related to a legitimate legislative purpose, it would not violate due process.

The Supreme Court began its analysis by recognizing a number of cases wherein it upheld retroactive tax legislation against

a due process challenge when the legislation was not so " 'harsh and oppressive as to transgress the constitutional limitation.' " *Id.* at 30, 114 S.Ct. 2018 (quoting *Welch v. Henry,* 305 U.S. 134, 147, 59 S.Ct. 121, 83 L.Ed. 87 (1938)). To explain "harsh and oppressive," the Court stated that these words were equivalent to "arbitrary and irrational," *id.,* and explained:

> " 'Provided that the retrospective application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches....
>
> ... The retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former.... *But that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose.' "*

*Id.* at 30–31, 114 S.Ct. 2018 (quoting *Pension Benefit Guaranty Corporation v. R.A. Gray & Co.,* 467 U.S. 717, 729–30, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984)) (some internal quotation marks omitted, citations omitted, emphasis added, first and third omission in original).

The Respondent in *Carlton* had legitimately taken advantage of an estate tax deduction under a revised statute which would have saved the estate a significant amount of money. A little over a year later, Congress recognized that the statute was overbroad and enacted a curative amendment limiting the deduction to such a degree that it would no longer apply to the estate. It did so by making the amendment retroactive as if incorporated in the original deduction provision. The IRS disallowed the deduction, and Carlton paid the asserted deficiency, plus interest. He then filed a claim for a refund, and instituted a refund action in federal district court, claiming a due process violation. The district court rejected his due process argument. A divided panel of the Ninth Circuit Court of Appeals reversed on the grounds of inadequate notice of the retroactive amendment and that the taxpayer had relied to his detriment on pre-amendment law.

The Supreme Court found that Carlton's lack of notice was not dispositive because a taxpayer takes his chances that there will be an increase in the tax burden which might come about when the government carries out an established policy of taxation. Further, it held that since the amendment had not been made for an improper purpose, such as inducing Carlton to rely on the statute only to target him after the fact, and given that he had no immunity from taxation because it was neither a penalty nor a liability but only his obligation in exchange for the benefits of government, his reliance on the pre-amendment statute alone was insufficient to establish a constitutional violation.

Instead, the Supreme Court held the view of the Ninth Circuit Court of Appeals to be an unduly strict standard: "Because we conclude that retroactive application of the 1987 amendment to Section 2057 is rationally related to a legitimate legislative purpose, we conclude that the amendment as applied to Carlton's 1986 transactions is consistent with the Due Process Clause." *Id.* at 35, 114 S.Ct. 2018. It is notable that this ultimate holding did not mention a "modesty" requirement (on which the Court of Appeals relied in this case), though the majority did note with favor that Congress had acted promptly and applied only a modest period of retroactivity (meaning that the length of the period of retroactivity is to be considered as part of the test of whether the statute is a rational means of achieving the government's goal).

In fact, only Justice O'Connor stated in her concurring opinion that the retroactivity period should not exceed one year, thus implying that she considered "modesty" to be a due process guarantee. Her separate opinion carried no other votes.

Justices Scalia and Thomas, in a separate concurring opinion, took the view that time is not even a relevant consideration. Instead, they focused on the fact that the taxpayer has already relied on the statute, and the amendment comes after that reliance. They felt that whether the amendment comes immediately after or long after does not change the fact of deprivation after reliance on then existing law. *See id.* at 40, 114 S.Ct. 2018 (Scalia, J., concurring) ("The reasoning the Court applies to uphold the statute in this case guarantees that all retroactive tax laws will henceforth be valid.").

Retroactive application of a statute need only be (1) supported by a legitimate legislative purpose (2) furthered by rational means, which includes an appropriate modesty requirement. This requires analysis of the facts and circumstances of each case, rather than applying a specified modesty period. The pertinent question is whether the period of retroactivity is one that makes sense in supporting the legitimate governmental purpose (rationally related).

Despite these differences, Justices O'Connor, Scalia and Thomas did concur in the result of the case, joining the majority in saying that retroactive application of revenue measures is rationally related to the legitimate governmental purpose of raising revenue, to prevent a "significant and unanticipated revenue loss." As Justice Scalia wrote in his separate concurring opinion,

> To pass constitutional muster the retroactive aspects of the statute need only be "rationally related to a legitimate legislative purpose." Revenue raising is

certainly a legitimate legislative purpose, and any law that retroactively adds a tax, removes a deduction, or increases a rate rationally furthers that goal. I welcome this recognition that the Due Process Clause does not prevent retroactive taxes, since I believe that the Due Process Clause guarantees *no* substantive rights, but only (as it says) process.

*Id.* at 40, 114 S.Ct. 2018 (Scalia, J., concurring) (internal citations omitted).

Clearly, eight of the nine justices viewed what may "rationally further" a legitimate governmental interest as being broader than the one year that only Justice O'Connor would impose as a "modesty" measure. Thus what is "modest" or acceptable for due process purposes depends on the facts of the case, including notice, settled expectations, detrimental reliance, etc.

This was demonstrated when, following *Carlton,* in 1996 the Ninth Circuit (where *Carlton* originated) held in *Montana Rail Link, Inc. v. United States,* 76 F.3d 991 (9th Cir.1996), that a statute with a seven year retroactivity period did not violate due process. The facts of that case are strikingly similar to this one.

Montana Rail was required to pay an excise tax on compensation it paid to its employees, and to withhold a tax imposed on railroad employees under a retirement system separate from social security though paid to the Internal Revenue Service. For several years, Montana Rail treated as taxable compensation its contributions to 401(k) plans, but on advice of the Railroad Retirement Board, stopped including 401(k) contributions when calculating the amount of employee compensation for retirement fund purposes in 1987 and 1988. This resulted in what it considered to be a tax overpayment for those years, so Montana Rail refunded that amount to its employees, and sought a

refund of this overpayment from the government.

In December 1989, Congress redefined the railroad retirement tax compensation base to specifically include contributions to 401(k) plans as part of the taxable compensation, and specifically made the change retroactive to " 'remuneration paid before January 1, 1990 . . . .' " *Id.* at 993 n. 1 (quoting Omnibus Budget Reconciliation Act of 1989, § 10206(c)(2)(A)). This affected the tax status of these retirement contributions from 1983, when the ambiguity arose, forward. Montana Rail's refund request was denied. But it claimed that it had relied on the advice of the Board and the then existing state of the law, and that to deny its refund would violate due process. Montana Rail filed suit in federal district court seeking the refund, but its claim was denied there also.

The Ninth Circuit Court of Appeals upheld the district court ruling, specifically applying *Carlton* to find that Congress had the legitimate legislative purpose of protecting the reliance interests of employees who were expecting to receive higher benefits based on the taxes paid and withheld, and to avoid loss of revenue. It specifically held that the period of retroactivity bore a rational relation to the underlying legislative purpose, and that the seven year retroactivity period was appropriate because

> [g]iving § 10206(b) a one or two year period of retroactivity would have severely hurt workers who had retired expecting that they would receive a level of benefits based in part on tax payments made from 1983 through 1987. A shorter period of retroactivity would have been arbitrary and irrational.

*Id.* at 994 (internal citations omitted).

Further the Ninth Circuit pointed out that

> MRL erroneously equates its mistaken overpayment of taxes with the government's "unlawful," "improper" and "erroneous" collection of taxes. Contrary to MRL's assertion, the IRS did not violate any federal law by accepting MRL's overpayment. Seeking a refund for one's own voluntary overpayment of a lawful tax is not the same as pursuing a remedy for payment of an illegal tax.

*Id.* at 995.

In light of *Carlton* and *Montana Rail* it becomes clear that the opinion of the Kentucky Court of Appeals gave undue weight to dicta in Justice O'Connor's concurring opinion when it held that this case turned on a one year "modesty" requirement. The issue instead is only whether the retroactive statute of 2000 rationally furthers the legitimate governmental purpose of raising and controlling revenue to prevent a significant and unanticipated revenue loss. Applying that test here, there can be no question that the legislature acted to correct what it viewed as a mistake in *GTE*'s interpretation of the law, that it had a legitimate governmental purpose (raising and controlling revenue) and that the statute rationally furthers this purpose. Further, to prevent a significant and unanticipated revenue loss, Appellees had been on notice of the revenue intent from 1988 when RP 41P225 was issued until 1994 when *GTE* was decided, and could not have had any "settled expectations" to the contrary.

Additionally, the legislature's intent to supercede *GTE* became apparent almost immediately. In the 1996 session, the legislature amended KRS 141.120 to disallow filing a combined return under the unitary business concept, and developed its own approach to filing a consolidated return based on affiliation, specifically ownership. It made the statute effective for any tax year ending on or after December 31, 1995. That taxpayers would attempt to amend their returns to combined returns

under the unitary business concept in order to claim under the refund statute was literally an unknown, because the legislature had no means of knowing who would wish to combine their separate returns in order to request a refund, or even if a refund would be required after they did.

By the beginning of the next biennial legislative session the effect of *GTE* was still not clear. Sometime during the session, however, evidence of such claims was raised, and the problem was addressed through the budget bill, which directed Revenue not to pay refunds on attempts to amend separate returns to combined returns under the unitary business concept in order to make a claim for a refund under *GTE*. By the 2000 session, the problem had been defined, and the legislature amended KRS 141.200 to disallow the filing of combined returns under the unitary business concept for any taxable year ending on or before December 31, 1995, and to disallow the payment of refunds on amended returns filed after December 22, 1994, (not coincidentally, the date *GTE* was decided). At the first reasonable opportunity, as it became aware of the issues, the legislature, which met then only biennially, made provisions and amendments.

While it might be tempting to require the legislature to be omniscient so as to immediately understand the ramifications of case law on statutory application, history tells us that often the development of law based on the holdings in cases takes time to go through process before the clear impact can be seen. Combine this with delays caused by a biennial legislative schedule, and it is rational that the legislature acted with reasonable diligence in this complicated matter.

█ As *Carlton* held, to pass constitutional muster, a retroactive statute need only be rationally related to a legitimate legislative purpose, which in this case as in *Carlton* was a significant and unantic-ipated revenue loss. Revenue raising is the sole province of the legislature, and the courts should involve themselves in it only when clear constitutional or interpretive issues arise. While due process is certainly a constitutionally protected right, it is not impacted under the facts of this case, given the clear and lengthy notice, the lack of settled expectations and lack of detrimental reliance. All the legislature did was clarify the statute after this Court interpreted it in *GTE*.

Taking another tack, Appellees have argued that in a case decided before the Supreme Court later in 1994, the Court ruled that a State may not "bait and switch" remedies when a taxpayer seeks a refund of illegally or unconstitutionally collected taxes which require this Court to find that they are entitled to a refund of an overpayment of taxes due to being required to file separate returns when they were entitled to file a combined return under the unitary business plan. *Reich v. Collins*, 513 U.S. 106, 115 S.Ct. 547, 130 L.Ed.2d 454 (1994). This case, however, is clearly distinguishable from the present circumstances on its facts and legal questions.

*Reich* concerned a common practice where state retirement benefits were exempt from state income taxes, but federal retirement benefits were not. After the Supreme Court found that this practice violated the constitutional intergovernmental tax immunity doctrine, most states repealed the special tax exemption for state retirees, but did not automatically refund the illegal taxes to federal retirees. Reich sued Georgia for a tax refund under its refund statute. The case took several twists and turns, but finally ended up with the United States Supreme Court holding that Georgia could not change its deprivation remedy in the middle of the stream by arbitrarily declaring that its clear post-

deprivation remedy would no longer apply because it was going to exclusively rely on its pre-deprivation remedy. Justice O'Connor wrote that Reich was entitled to pursue the post-deprivation remedy, regardless of whether Georgia also had pre-deprivation remedies, because the language in the refund statute would lead the average taxpayer to think it obvious that he could avail himself of that remedy. Georgia had effectively taken away any remedy at all by changing to its pre-deprivation remedies exclusively after Reich had already paid the unconstitutional taxes.

The *Reich* decision followed *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco, Dept. of Business Regulation of Florida,* 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990), which dealt with an attempt by Florida to tax certain types of Florida products more favorably than other products that had been found to be unconstitutional as a violation of the Commerce Clause. The Florida Supreme Court had recognized the unconstitutionality, but had declared that relief would be prospective only, and did not allow a refund to the challengers. Reversing this, Justice Brennan wrote for a unanimous court

> If a State places a taxpayer under duress promptly to pay a tax when due and relegates him to a postpayment refund action in which he can challenge the tax's legality, the Due Process Clause of the Fourteenth Amendment obligates the State to provide meaningful backward-looking relief to rectify any *unconstitutional* deprivation.

*Id.* at 31, 110 S.Ct. 2238 (footnote omitted, emphasis added).

It is important to note that the Supreme Court made its ruling in *McKesson* premised upon a refund being due for an *unconstitutional* application of a tax, which naturally impacts federal due process.

However, this Court in *GTE* did not make a constitutional declaration, but instead merely interpreted a *constitutional* statute. That decision did not in any way impact the process for a remedy available to the taxpayers; it merely said that another process for filing returns was also available. Since constitutionality was not involved, the analysis then goes from deprivation of property without due process of law to the well-established analysis of when and how the government may enact economic legislation, specifically revenue-controlling legislation, under the *Carlton* line of cases.

The present case differs from *Reich* and *McKesson* in many important ways. Here, Appellees claim that their right to file a combined return under the unitary business concept pursuant to the holding in *GTE* was improperly taken from them. They filed for a refund under *GTE*'s interpretation of the statute, but in order to be eligible to get a refund, they had to change their return from separate returns to a combined return under the unitary business concept, which required taking the paperwork of several different returns and combining them into one return. Only after this was done would Appellees become eligible for a refund. While they may have been denied their choice of the most advantageous return, the returns that they did file were not illegal, and certainly could have been the chosen method, even under *GTE*, if they would have been to the Appellees' advantage. In *Montana Rail* the Ninth Circuit made this same point, distinguishing that case from *Reich*, in upholding a law that was very similar in effect to this one.

The most significant difference, however, is that *Reich* and *McKesson* did not involve the retroactive application of a state tax statute that effectively changed the amount of tax owed and which was

enacted for a legitimate governmental purpose. While *Reich* came out the same year as *Carlton*, the cases are on two entirely different issues. Where the state of Georgia arbitrarily took away a "clear and certain" post-deprivation *remedy* for taking undisputedly illegal taxes in *Reich*, the legislature in this case took away the *dispute*, and hence any illegality that might be claimed, by properly enacting a retroactive statute that mooted the question of whether the Appellees were entitled to a refund. By retroactively declaring that combined returns were disallowed prior to 1995 and that no refunds would be allowed due to amendments to file combined returns under a unitary business concept, the legislature reestablished the status quo as it saw it prior to *GTE*. The remedy provided by the refund statute was not affected at all; it simply no longer applies to the Appellees in this case because the underlying tax law has been changed, just as the deduction no longer applied in *Carlton*.

## C. Equal Protection and Other Rights

The Appellees also argue that the tax amendments violate their equal protection rights and other rights under the Kentucky Constitution because other corporations were allowed to amend their returns and were granted tax refunds. However, the controlling fact in this case is the government's power to tax and to enact legislation that controls the revenue stream. Since a taxpayer has no immunity from taxation, which is not a contractual liability but rather the shared costs of the benefits of government, no fundamental right is involved. *Carlton*, 512 U.S. at 33–34, 114 S.Ct. 2018. Rather, statutes or practices that have the effect of distinguishing between entities solely on an economic basis are "presumed to be valid and ... generally comply with federal equal protection requirements if the classifications that they create are rationally relat-

ed to a legitimate state interest." *Durham v. Peabody Coal Co.*, 272 S.W.3d 192, 195 (Ky.2008) (citing *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). The analysis is the same under the Kentucky Constitution. *Id.* This "rational basis" test is the same as required under due process for economic legislation, and, as discussed above, the 2000 amendments to the tax statute clearly satisfy it. The question in all matters falling short of a fundamental right, and particularly to economic or taxation legislation, is whether there is a legitimate governmental purpose for the action, and whether the means used to accomplish it rationally relates to that purpose. Having found that such a purpose exists in this case, there is no merit to the Appellees' claims.

## III. Conclusion

Because the amendments to the Kentucky tax code made by the legislature in 1996 and 2000 were made to clarify the law in regard to combined returns under the unitary business plan and to exercise its revenue-raising powers, they further a legitimate governmental purpose. Moreover, the amendments were rationally related to that purpose. Consequently, Appellees' due process rights have not been impacted and they are not entitled to tax refunds because they could not amend their separate returns to a combined return under the unitary business plan. The opinion of the Court of Appeals is reversed.

SCOTT and VENTERS, JJ., concur.

SCHRODER, J., concurs in result only by separate opinion.

ABRAMSON, J., dissents by separate opinion in which CUNNINGHAM, J., joins.

MINTON, C.J., not sitting.

SCHRODER, Justice, concurring in result.

While the majority utilizes the correct legal framework and arrives at the correct result, I disagree with some observations and portions of the analysis in its opinion. Therefore, I write a separate, albeit legally similar, opinion.

From 1972 through 1988, the Revenue Cabinet (the "Cabinet") interpreted KRS 141.120 to allow corporations to file unitary tax returns. In 1988, the Cabinet issued Revenue Policy 41P225, which prohibited the filing of unitary returns, and required separate returns.[1] GTE challenged the Cabinet's policy shift in a case that reached this Court in 1994. In an opinion rendered December 22, 1994, this Court decided in GTE's favor. *GTE v. Revenue Cabinet,* 889 S.W.2d 788 (Ky.1994). GTE interpreted KRS 141.120 as allowing unitary filing, and invalidated RP 41P225 under the doctrine of contemporaneous construction. *Id.* at 792. Because their taxes would have been lower under the unitary method of filing, a number of corporations, seeking refunds, thereafter amended their returns to unitary returns for various years in which RP 41P225 was in effect. Although the Cabinet acted on some of the refund claims, it took no immediate action on Appellees' claims.

The Cabinet began tracking actual and potential claimants and the amount of their claims by the end of 1995. At that time, the Cabinet estimated the claims to be worth about $50 million. In the first legislative session following the *GTE* decision, 1996, the General Assembly enacted H.B. 599, which abolished the filing of unitary returns for tax years ending on or after December 31, 1995. This legislation, however, had no effect on the pending refund claims.

In October 1996, the Cabinet estimated unpaid refund claims to be worth approximately $160 million, which rose to $177 million by April 1997. In response, to avoid a huge loss to the general fund, at the next legislative session, 1998, the General Assembly included in the 1998–2000 budget bill, a measure which prohibited the Revenue Cabinet from paying any post-*GTE* refund claims. H.B. 321, § 33. Several parties challenged the prohibition. The Franklin Circuit Court invalidated the provision on grounds that it did not comply with the "reenactment and republication" provisions of Section 51 of the Kentucky Constitution. The Cabinet appealed to the Court of Appeals. While the appeal was pending, H.B. 321 expired on its own terms (in 2000), and the Court of Appeals dismissed the appeal as moot.

The claims had risen to nearly $200 million at the end of June 1998, with $65 million of that being interest. At the 2000 legislative session, faced with this massive drain of the state treasury as a result of the pending refund claims, the General Assembly enacted H.B. 541, the legislation at issue in this case. H.B. 541 substantially amended KRS 141.200, and (1) prohibited refund claims for taxable years ending on or before December 31, 1995, made by amended return filed after December 22, 1994, based on a change from separate to unitary return, and (2) prohibited corporations from filing unitary returns for tax years ending before December 31, 1995, unless the corporations filed unitary returns on or before December 22, 1994, for tax years ending before December 22, 1994. The effect of H.B. 541 was to extinguish Appellees' refund claims.

Two declaratory judgment actions were filed in the Franklin Circuit Court seeking

---

1. The policy permitted unitary reporting only if the subsidiaries were a sham or paper corporation with limited viable activities. *GTE*

*v. Revenue Cabinet,* 889 S.W.2d 788, 790 (Ky. 1994).

to have the retroactive portions of H.B. 541 declared unconstitutional. The two cases were consolidated and the circuit court, finding the legislation constitutional, granted summary judgment to the Cabinet. The Court of Appeals reversed on grounds that the period of retroactivity was excessive. This Court granted discretionary review.

It is well settled that a tax act is not necessarily unconstitutional because it is retroactive. *Welch v. Henry*, 305 U.S. 134, 147, 59 S.Ct. 121, 83 L.Ed. 87 (1938). Retroactive tax legislation satisfies the Due Process Clause provided that it " 'is supported by a legitimate legislative purpose furthered by rational means.' " *United States v. Carlton*, 512 U.S. 26, 30–31, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994) (*quoting Pension Benefit Guaranty Corporation v. R.A. Gray & Co.*, 467 U.S. 717, 729, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984)). The United States Supreme Court has repeatedly upheld retroactive tax legislation against a due process challenge. *Id.* at 30, 114 S.Ct. 2018 (*citing United States v. Hemme*, 476 U.S. 558, 106 S.Ct. 2071, 90 L.Ed.2d 538 (1986); *United States v. Darusmont*, 449 U.S. 292, 101 S.Ct. 549, 66 L.Ed.2d 513 (1981); *Welch v. Henry*, 305 U.S. 134, 59 S.Ct. 121, 83 L.Ed. 87 (1938); *United States v. Hudson*, 299 U.S. 498, 57 S.Ct. 309, 81 L.Ed. 370 (1937); *Milliken v. United States*, 283 U.S. 15, 51 S.Ct. 324, 75 L.Ed. 809 (1931); *Cooper v. United States*, 280 U.S. 409, 50 S.Ct. 164, 74 L.Ed. 516 (1930)).

The General Assembly's purpose in enacting H.B. 541 was to prevent a massive loss to the state treasury as a result of the GTE decision.[2] In *United States v. Carlton*, the United States Supreme Court held that the prevention of a "significant and unanticipated revenue loss" satisfies due process as a legitimate legislative purpose for a retroactive tax statute. 512 U.S. at 32, 114 S.Ct. 2018. *Carlton* involved a new estate tax provision, 26 U.S.C. Section 2057, enacted on October 22, 1986, which granted a deduction for half the proceeds of "any sale of employer securities by the executor of an estate" to "an employee stock ownership plan." *Id.* at 28, 114 S.Ct. 2018. The purpose of the deduction was to promote employee ownership. Congress initially estimated a revenue loss from Section 2057 of approximately $300 million over a five year period. *Id.* at 31–32, 114 S.Ct. 2018. On December 10, 1986, Carlton, executor of an estate, used estate funds to purchase MCI stock for $11.2 million which he resold two days later to the MCI ESOP for $10.6 million, a loss of $600,000, for the express purpose of claiming a tax deduction of $5.3 million (half the proceeds of the sale) under Section 2057, reducing the estate tax by $2.5 million.

Shortly after its passage, Congress realized that the expected revenue loss from Section 2057 could be as much as $7 billion, because of a loophole in the law which did not limit the deduction to situations in which the decedent owned the securities immediately before death. *Id.* at 32, 114 S.Ct. 2018. To protect the treasury against this massive loss, on December 22, 1987, approximately one year after Carlton's stock transaction, Congress amended Section 2057 to require that the securities

---

2. The legislative purpose of H.B. 541 could not be more clear:

"[I]f we don't do this [pass H.B. 541], it could cost us up to $190 million ... These corporations that are involved did not plan their business based on filing the way that they are now attempting to come back and get refunds ... But now they want to come back and raid the state treasury ... to the tune of $190 million. And that's what this bill is all about ... [I]f we don't do it, then we better figure out how to cut the budget $190 million." Remarks of Chairman Moberly, Transcript of Hearing on H.B. 541, February 22, 2000.

sold to an ESOP must have been owned by the decedent immediately before death. The 1987 amendment was made retroactive as if it had been contained in the statute as originally enacted in October, 1986. *Id.* at 29, 114 S.Ct. 2018. Carlton's December, 1986, transaction was invalidated, causing the estate to incur a significant loss.

The Court upheld the 1987 amendment's retroactivity against Carlton's due process challenge. The Court held that the prevention of a "significant and unanticipated revenue loss" was a legitimate legislative purpose, and that the amendment was a rational means of achieving said purpose. *Id.* at 32, 35, 114 S.Ct. 2018. The Court recognized that while Congress might have chosen to make up the loss by burdening equally "innocent" taxpayers, through general prospective taxation, it was not arbitrary nor unreasonable to choose to prevent the loss by retroactively denying the deduction to taxpayers who had engaged in purely tax-motivated (albeit legal) stock transfers. *Id.* at 32, 114 S.Ct. 2018. The Court found Carlton's detrimental reliance upon the provision and lack of notice insufficient to establish a due process violation, as "[t]ax legislation is not a promise, and a taxpayer has no vested right in the Internal Revenue Code." *Id.* at 33, 114 S.Ct. 2018. The Court observed with approval that the period of retroactivity was short, just over one year. *Id.* at 32–33, 114 S.Ct. 2018. The period was therefore one that did not upset longstanding and settled taxpayer expectations. *See id.* at 37–38, 114 S.Ct. 2018 (O'Connor, J., concurring).

Similarly, H.B. 541 serves the legitimate legislative purpose of preventing a massive loss to the state treasury as a result of refund claims being filed in the wake of *GTE.* The legislature's decision to prevent the loss by prohibiting amended returns under the unitary method filed after December 22, 1994 (the date *GTE* was ren-dered) for years prior to 1995 is rationally related to that purpose. The Franklin Circuit Court and Court of Appeals correctly found as such.

The Court of Appeals erred, however, in concluding that H.B. 541 nevertheless violated due process because its period of retroactivity was excessive. The Court of Appeals misinterpreted *Carlton* as setting a bright-line rule as to what is an acceptable period of retroactivity, relying on the Court's approval of the "modest" (slightly over one year) period of retroactivity in that case. The consideration of "modesty" relates to a taxpayer's right at some point to settled expectations. *See Carlton,* 512 U.S. at 37–38, 114 S.Ct. 2018 (O'Connor, J., concurring). In this regard, the United States Supreme Court has indicated that where a taxpayer had no notice or could not have anticipated a change in a tax (as in *Carlton* ) that it is plausible a tax could attempt to reach so far into the past as to offend due process. *Welch,* 305 U.S. at 148, 59 S.Ct. 121. The Court has never established a bright-line rule as to what this period would be. Rather, whether a retroactive tax act "transgress[es] the constitutional limitation" depends upon the facts and circumstances of the particular case. *Id.* at 147, 59 S.Ct. 121; *Milliken v. United States,* 283 U.S. 15, 21, 51 S.Ct. 324, 75 L.Ed. 809 (1931).

The Court has indicated, however, that where at the time of the taxable event the taxpayer *had* notice of even a potential change in a tax law, due process is not offended when the retroactive period encompasses the time of the taxable event. *See Milliken,* 283 U.S. at 21, 24, 51 S.Ct. 324; *see also Welch,* 305 U.S. at 147–148, 59 S.Ct. 121. At the time of the taxable event in this case (the receipt of income during the years RP 41P225 was in effect), the Appellees were fully aware that their tax liability would be computed under the separate return method. They paid their

taxes under the separate return method. They were not permitted to file unitary, and could have had no "settled expectations" to the contrary. At this point, if there were any "settled expectations" they were the Commonwealth's, not the taxpayers'. *King v. Campbell County,* 217 S.W.3d 862, 870 (Ky.App.2006). Nor did Appellees obtain a vested right in a refund following the *GTE* decision. *See id.* at 869–870. The Appellees' expectations could not be deemed settled or vested in this case. As the majority noted, the legislature's intent to supercede *GTE* became apparent almost immediately—at the first legislative session following *GTE,* the General Assembly began a process of legislatively undoing the decision.[3] As the influx of claims increased, so did the General Assembly's response, culminating in its response here, H.B. 541. Therefore, I agree with the majority that the period of retroactivity does not impact due process under the facts of this case, given the clear and lengthy notice, the lack of settled expectations, and the lack of detrimental reliance.

Finally, while it is well settled that due process requires "meaningful backward-looking relief" for taxes collected in violation of the law or constitution, the taxes paid by the Appellees under the separate return method were neither illegal, nor unconstitutional. *McKesson Corp. v. Div. of Alcoholic Beverages and Tobacco,* 496 U.S. 18, 31, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990); *Reich v. Collins,* 513 U.S. 106, 114, 115 S.Ct. 547, 130 L.Ed.2d 454 (1994).

As to the remaining issues, I concur with the result reached by the majority as well.

ABRAMSON, Justice, dissenting.

This corporate tax case presents a rather straightforward question: how aggres-

sively may the General Assembly legislate after-the-fact in an effort to retain tax monies which this Court has held were collected in contravention of state law? Whether the taxpayer is an individual citizen or a corporation, the answer to that question lies in the Due Process Clause of the Fourteenth Amendment to the United States Constitution which prohibits the taking of property without due process of law. Generally, a sovereign must provide "meaningful relief" in the form of a refund of the invalidly collected taxes and, while there is some latitude to legislate tax law retroactively, that power must be exercised promptly for a legitimate purpose and for a modest period. The 2000 Kentucky General Assembly exceeded the bounds of due process when it passed H.B. 541 in an effort to undo entirely this Court's ruling over five years earlier in *GTE v. Revenue Cabinet,* 889 S.W.2d 788 (1994). Neither the complete ban of all outstanding tax refund claims associated with the *GTE* case nor the retroactive rewrite of state tax law to condone the retention of corporate taxes invalidly collected five to twelve years previously passes constitutional muster. By upholding these long after-the-fact revisions of our tax laws, the majority misconstrues the constitutional restraints. Accordingly, I respectfully dissent.

While a full understanding of this matter entails appreciation of various approaches to corporate tax which are addressed later, the basic facts can be simply stated. For sixteen years, from 1972 until 1988, any corporation which qualified as a so-called "unitary business" was allowed to file Kentucky tax returns on a unitary or combined-reporting basis. In 1988, without

---

**3.** A legislative body must have reasonable opportunity to act. *Welch,* 305 U.S. at 149, 59 S.Ct. 121.

any action on the part of our legislature, the Revenue Cabinet issued Revenue Policy 41P225, abruptly halting the right of virtually all corporate taxpayers to file the unitary returns which had been accepted for years. Faced with higher taxes as a result of the stroke of an administrator's pen, several taxpayers sued and ultimately prevailed before the Kentucky Supreme Court. In *GTE v. Revenue Cabinet, supra*, this Court concluded that the Cabinet's and taxpayers' longstanding reading of KRS 141.120 was a reasonable one and, under the doctrine of contemporaneous construction, that reading had become binding on the Cabinet unless and until the General Assembly expressed a contrary intent.

Taxpayers responded to *GTE* by filing amended returns on a unitary basis but, after processing and settling some of the refund claims, the Cabinet sought legislative intervention. A stop-gap measure delaying all refunds was passed in 1998 and then an attempted complete "clean up" of the situation obliterating all rights to refunds was passed by the 2000 General Assembly in the form of H.B. 541. That bill had two provisions dedicated to a single purpose. One provision withdrew from those corporate taxpayers who had filed amended unitary returns and were seeking refunds post-*GTE* the basic refund right codified in KRS 134.580 and ordinarily available to all taxpayers who have paid taxes later determined to be invalid. The second provision was an attempt to recast pre-*GTE* law and destroy the legal underpinnings of the taxpayers' refund claims (and this Court's holding in *GTE*) by stating retroactively that indeed the position stated by the Cabinet in RP 41P225 had always been the law.

Our Court of Appeals invalidated H.B. 541 as a violation of the taxpayers' due process rights. On appeal, the Cabinet maintains that the appellate court's due process analysis was wrong and in any event the Commonwealth's sovereign immunity trumps the taxpayers' due process rights. The Commonwealth argues, in essence, that it can collect taxes in contravention of law, litigate and lose before this Court, and then assert sovereign immunity to retain tax monies this Court found were invalidly collected. The sovereign is powerful but it too must answer to the Constitution and, more specifically, it too is constrained by the due process protections afforded its citizens for otherwise that Clause would be rendered meaningless. H.B. 541 is unconstitutional and these taxpayers are entitled to pursue the meaningful remedy which is codified in KRS 134.580, grounded in the Due Process Clause and available to all taxpayers who have paid taxes subsequently deemed invalid.

### RELEVANT BACKGROUND AND PROCEDURAL HISTORY

Tax litigation is almost inevitably complex and this case is no exception. A brief discussion of the "unitary business concept" and its history in Kentucky tax law will provide context for the analysis that follows.

### State Tax of Corporate Income—Apportionment.

Many corporations today engage in businesses that extend into more than one state and thus states wishing to tax these corporations' income are confronted with the problem of apportioning that income among themselves.[1] Almost since the in-

---

1. This is a problem fraught with constitutional implications, as the states' ability to tax interstate enterprises is significantly constrained by both the Due Process Clause and Commerce Clause. *Mobil Oil Corporation v. Commissioner of Taxes of Vermont*, 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980).

ception of income taxes, various methods of effecting that apportionment have been employed, but in 1966 our General Assembly adopted the method devised by the American Bar Association's Commission on Uniform State Laws and published as the Uniform Division of Income for Tax Purposes Act (UDITPA). *See* KRS 141.120. Under UDITPA, a multi-state enterprise's income is characterized as either business or non-business. The non-business income is allocated to the source state pursuant to various sourcing rules, while the business income—income arising from transactions and activity in the regular course of a trade or business—is apportioned among the states contributing to that income according to an apportionment formula based on the proportion of the enterprise's property, payroll, and sales in the taxing state compared with its total property, payroll, and sales. Although the General Assembly has since modified the apportionment formula to give additional weight to the sales factor, Kentucky's approach to apportionment is still essentially the formulary UDITPA approach adopted in 1966. KRS 141.120(8).

### Determining the Apportionable Income.

### Separate Accounting.

Related to the problem of apportioning a multi-state enterprise's business income is the no less fundamental problem of defining the enterprise whose income is to be apportioned. The problem arises from the fact that many corporate enterprises are organized not as single corporations but as clusters or chains of related corporations. This fact has given rise to three primary taxing responses. One response is for the taxing state to ignore the larger enterprise and to treat each corporate component as a separate entity, taxing the entities with nexus in the state solely on the basis of their own individual incomes. This approach is known as the "separate entity" or "separate accounting" approach.

### Combined Reporting.

Another approach is for the taxing state to treat the entire enterprise as in essence the entity to be taxed and to apply its apportionment formula to the entire group's combined income. This is the approach known as the "unitary-business/formula-apportionment" method or the "combined reporting" method. As one commentator has stated:

> The purpose of combined reporting is to determine the income of a multistate taxpayer attributable to a given state. This is accomplished by applying the apportionment factors of the unitary business to the unitary group's business income. . . .
>
> A combined report does not necessarily involve a single tax return for the group. Instead, it is the name given to a series of calculations by which a unitary business apportions its income on a geographic basis. In California, for example, each entity with nexus files its own return providing schedules reflecting the unitary activity. However, the [Franchise Tax Board] has adopted procedures under which some or all of the taxpayer-members of a unitary group may elect to file a group return.

Giles Sutton, "Comparison of Group Reporting Methods and Sourcing of Income," 9 St. 8s Loc. Tax Law. 29 (2004). A "unitary business" for this purpose is generally understood to be a multi-state, multi-corporate enterprise whose "operations conducted in one state benefit and are benefited by the operations conducted in another state or states. If its various parts are interdependent and of mutual benefit so as to form one integral business rather than several business entities, it is unitary." *Pioneer Container Corporation v. Beshears*, 235 Kan. 745, 684 P.2d 396, 399 (1984) (internal quotation marks omitted). Where the components of a multi-

state enterprise are integrated by sufficient unity of ownership, operation, and use, the unitary business concept has been applied. *Edison California Stores v. McColgan*, 30 Cal.2d 472, 183 P.2d 16 (1947); *Armco Inc. v. Revenue Cabinet*, 748 S.W.2d 372 (Ky.1988). The United States Supreme Court has held that the unitary-business/formulary-apportionment approach to corporate income taxation passes constitutional muster provided that "at least some part of [the unitary business] is conducted in the state," that "there be some bond of ownership or control uniting the purported 'unitary business,' " and that "the out-of-State activities of the purported 'unitary business be related in some concrete way to the in-State activities.' " *Container Corporation of America v. Franchise Tax Board*, 463 U.S. 159, 166, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983). Indeed, at least in part because of its elevation of the enterprise's substance over its form, the U.S. Supreme Court has characterized the unitary business principle as "the linchpin of apportionability in the field of state income taxation." *Mobil Oil Corporation, supra,* 445 U.S. at 440, 100 S.Ct. 1223.[2]

### Consolidated Returns.

Kentucky's posture vis-à-vis combined reporting or the "unitary business concept" underlies the present controversy, but before turning to the specific facts of this case, a third legislative response to the taxing of multi-corporate enterprises deserves mention. Under federal tax law, an "affiliated group" of "includible corporations" may elect to file a "consolidated" return, *i.e.,* a single return for the entire affiliated group. 26 U.S.C. §§ 1501–1504. Sutton, "Comparison of Group Reporting Methods," *supra.* "Affiliation" for this purpose is not defined in terms of the member corporations' unified business, but solely in terms of ownership and control, generally including all inter-corporate connections where there is 80% or more of both ownership and control.[3] *Id.* A consolidated return is not the same as a combined or unitary report:

> A *combined report* is an *accounting* method whereby each member of a group carrying on a unitary business computes its individual taxable income by taking a portion of the combined net income of the group. A *consolidated return* is a *taxing* method whereby two corporations are treated as one taxpayer.

*Caterpillar Tractor Co. v. Dept. of Rev.,* 289 Or. 895, 618 P.2d 1261, 1262–63 (1980).

Several states have adopted "consolidated return" provisions based on the federal model, and in 1996, the General Assembly amended KRS 141.200 by add-

---

**2.** Many commentators have described the advantages of combined reporting, including fairness to single-state corporations, accuracy, tax neutrality between different forms of corporate organization, and freedom from the accounting and tax-loophole problems associated with cross-border transfers among related corporations. *See for example* John A. Swain, "Same Questions, Different Answers: A Comparative Look at International and State and Local Taxation," 50 Ariz. L.Rev. 111 (2008); Mark J. Cowan and Clint Kakstys, "A Green Mountain Miracle and The Garden State Grab: Lessons From Vermont And New Jersey on State Corporate Tax Reform," 60 Tax Law. 351 (2007). Nevertheless, large-

ly as a result of successful corporate lobbying, as of 2005 only seventeen states had adopted mandatory combined reporting. *Id.*

**3.** The "unified business" for combined reporting purposes will not necessarily be the same as the "affiliated group" for consolidated return purposes. The unified business may include related entities with 50% to 80% ownership, for example, while the affiliated group will not, and the affiliated group will include all affiliates with 80% or more ownership, whether or not part of a unified enterprise, whereas the unified business will exclude entities that are not part of the same unified enterprise regardless of ownership share.

ing definitions of "affiliated group" and "consolidated return" that incorporate the corresponding federal definitions and by permitting affiliated groups to file consolidated returns, but only if the group consents to use consolidated status for eight years. Otherwise the 1996 version of KRS 141.200 requires separate entity reporting. The 1996 session of the General Assembly also amended KRS 141.120 by adding a provision expressly disavowing the "unitary business concept." The 1996 amendments have since been updated, and the provision disavowing the unitary business concept has been moved to KRS 141.200(15), but its basic reporting options remain in effect. Since 1996 it has been clear that the UDITPA-based apportionment provisions of KRS 141.120 apply to single corporations with income both within and without Kentucky and to "affiliated groups" of corporations with such multi-state income, but not to multi-corporate "unified businesses" under the "unitary business concept." Prior to 1996, however, the law in Kentucky was less clear, and it is that prior law which underlies this case.

### Procedural History

#### 1972–1988—The Cabinet Accepts and Then Rejects Combined Reporting.

As noted above, formulary apportionment of interstate income was early on associated with the unitary business concept and combined reporting. Thus, although UDITPA does not itself include reporting provisions, the General Assembly's 1966 adoption of the UDITPA apportionment scheme was perceived by the Revenue Cabinet and by the courts as an embrace or a confirmation of combined or unitary reporting in Kentucky. That perception was based not only on case law upholding the use of combined reporting

together with formulary apportionment, for example *Mobil Oil Corporation, supra, Butler Bros. v. McColgan,* 315 U.S. 501, 62 S.Ct. 701, 86 L.Ed. 991(1942) and *Edison California Stores, Inc., supra,* but also on the fact that UDITPA is designedly consistent with a combined-reporting regime. In particular, as originally enacted in Kentucky, the UDITPA scheme required that "[a]ll business income shall be apportioned" pursuant to the property, payroll, and sales factors mentioned above. KRS 141.120(9) (1966). The law defined "business income" as "income arising from transactions and activity in the regular course of a trade or business of the taxpayer." KRS 141.120(1)(a) (1966). But "taxpayer" was left undefined, and thus the state was free to include in its approach to "taxpayers" the unitary business concept and to require combined reports where appropriate if it so chose.[4] Encouraging such an approach in Kentucky, aside from the tenor of the times, was the fact that even apart from UDITPA, Kentucky law recognized the notion of multi-corporate income accounting. KRS 141.205(1) (1966), for example, provided that

> [t]he department may require any parent corporation or subsidiary corporation doing business within this state to file a consolidated return covering the entire operations of the parent corporation and its subsidiaries, whenever it finds that the inter-corporate transactions of the related group tend to reduce the net income of the corporation, or corporations, doing business within this state below the amount that would probably result if such corporation, or corporations, was not a member of the related group.

For these reasons, and perhaps others, in 1972 the Revenue Cabinet began allow-

---

4. Another change introduced by the 1996 amendment of KRS 141.120 was substitution of the word "corporation" for UDITPA's "taxpayer."

ing unitary businesses to file combined or unitary reports under KRS 141.120. In 1974, the General Assembly apparently endorsed this policy by amending KRS 141.205 to provide expressly for "combined" as well as "consolidated" returns: "The department may require either a consolidated return or a combined return from any or all corporations conducting intercorporate transactions whenever the department finds that such intercorporate transactions reduce taxable net income … below the amount which would result if the transactions were at arms-length." The Cabinet's combined-return policy continued, with the acquiescence of the General Assembly, until 1988. In September of that year, however, the Cabinet abruptly made an about face. Without any legislative changes in the tax laws, the Cabinet issued Revenue Policy 41P225, by which it purported to limit combined reporting to parent-subsidiary relationships in which the subsidiary was a mere "paper corporation with limited viable activities." The effect of this policy shift was essentially to halt the filing of combined reports in Kentucky.

**GTE and Its Aftermath.**

Protest was not long in coming. GTE, a New York corporation active in Kentucky that had filed combined reports uniting it with its subsidiaries, promptly challenged the legality of the new policy. In an opinion rendered on December 22, 1994, this Court invalidated RP 41P225 as inconsistent with the Cabinet's own long-standing interpretation of KRS 141.120. That interpretation was a reasonable statutory reading, the Court held, and so, under the doctrine of contemporaneous construction, that reading had become binding on the Cabinet until the General Assembly ex-

pressed a contrary intent. *GTE*, 889 S.W.2d at 792–93.

In the wake of *GTE*, the Cabinet proposed a regulation mandating combined reporting in Kentucky. Kathryn L. Moore, "Taxation," 86 Ky. L.J. 875, 877–81 (1997–98). Corporate opposition was intense, however, prompting the withdrawal of the proposed regulation and adoption instead of the 1996 amendments to KRS 141.120 and 141.200 discussed above, the amendments disavowing the "unitary business concept" and providing for voluntary, federal-style consolidated returns. *Id.*

In the meantime, several corporate groups, including the Appellees, that had been precluded from filing combined reports during the life of RP 41P225 responded to *GTE* by filing amended returns on a combined or unitary basis for some or all of the affected tax years. Alleging that their tax liability was reduced when calculated on the basis of a combined report, these corporate groups also sought tax refunds. The Cabinet initially processed and settled a few of these refund claims, but by late 1996 or early 1997 its estimate of the claims' worth had risen substantially,[5] and at that point, apparently, the Cabinet ceased processing the claims and sought legislative intervention.

During its 1998 session the General Assembly enacted H.B. 321, which merely postponed the issue by providing that no post-*GTE* refund claims would be paid during the biennial budget period. That legislation expired in 2000. The 2000 session of the General Assembly then enacted H.B. 541, the legislation at issue here. As previously noted, H.B. 541 seeks to nullify Appellees' refund claims in two ways. First, it purports to withdraw retroactively in this small class of cases the refund

---

**5.** With interest, the outstanding claims are now said to total in excess of $200,000,000.00.

remedy ordinarily available to taxpayers who pay taxes later determined to be invalid. Second, it purports to remove the legal basis of the Appellees' claims by retroactively validating RP 41P225.

The Court of Appeals held that the retroactive reach of H.B. 541 exceeds what the Due Process Clause allows. On appeal to this Court, the Cabinet challenges the Court of Appeals' reading of the due process issue and argues as well that in any event its sovereign immunity trumps Appellees' due process rights. But first, the Cabinet invites us to do some retroactive validating of RP 41P225 of our own by revisiting *GTE*. In their cross-motion for discretionary review, Appellees maintain that H.B. 541 is unconstitutional for reasons in addition to its due process infirmities, most notably equal protection concerns arising from the fact that some taxpayers' post-*GTE* refund claims were processed. These other concerns are significant and are given short shrift by the majority. Because I would affirm the Court of Appeals on the due process issues, however, I will not address those other claims.

## *ANALYSIS*

### I. H.B. 541 Unconstitutionally Withdraws The Remedy For An Illegal Tax.

Section 1 of H.B. 541 amended KRS 141.200 in pertinent part by adding the following two provisions, now codified, respectively, as KRS 141.200(17) and 141.200(18):

> No claim for refund or credit of a tax overpayment for any taxable year ending on or before December 31, 1995, made by an amended return or any other method after December 22, 1994, and based on a change from any initially filed separate return or returns to a combined return under the unitary business concept or to a consolidated return,

shall be effective or recognized for any purpose.

> No corporation or group of corporations shall be allowed to file a combined return under the unitary business concept or a consolidated return for any taxable year ending before December 31, 1995, unless on or before December 22, 1994, the corporation or group of corporations filed an initial or amended return under the unitary business concept or consolidated return for a taxable year ending before December 22, 1994.

The first provision, KRS 141.200(17), pertains to the remedy available to corporate taxpayers post-*GTE*. As the parties note, in a case such as this one where the tax has not been challenged on constitutional grounds, KRS 134.580 is the applicable remedy statute. That statute provides in pertinent part that

> [w]hen money has been paid into the State Treasury in payment of any state taxes, except ad valorem taxes, whether payment was made voluntarily or involuntarily, the appropriate agency shall authorize refunds to the person who paid the tax, . . . of any overpayment of tax and any payment where no tax was due.

KRS 134.580(2). The Court of Appeals held, and I agree, that the Due Process Clause prohibits the General Assembly from withdrawing this remedy as KRS 141.200(17) purports to do.

### A. The Due Process Clause Mandates A Meaningful Remedy When Taxes Are Collected in Contravention of Applicable Law.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no state may "deprive any person of life, liberty, or property, without due process of law." The essence of this guarantee is that citizens must be given an opportunity, at a

meaningful time and in a meaningful manner, to challenge the legality of the government's impositions. *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Payment of a tax constitutes a deprivation of property, and the United States Supreme Court has held that to satisfy the requirements of the Due Process Clause, the taxing jurisdiction, the state in this case, must provide either pre-deprivation or postdeprivation procedural safeguards. *McKesson Corporation v. Division of Alcoholic Beverages and Tobacco,* 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990). Furthermore, where the state, as did Kentucky at the time these taxes were collected, requires or encourages its citizens to rely upon a postdeprivation refund action, that action "must provide taxpayers with, not only a fair opportunity to challenge the accuracy and legal validity of their tax obligation, but also a 'clear and certain remedy,' . . . for any erroneous or unlawful tax collection to ensure that the opportunity to contest the tax is a meaningful one." *Id.* at 39, 110 S.Ct. 2238 (quoting from *Atchison, T. & S.F.R. Co. v. O'Connor,* 223 U.S. 280, 32 S.Ct. 216, 56 L.Ed. 436 (1912)). The state may not, moreover, " 'hold[ing] out what plainly appears to be a "clear and certain" postdeprivation remedy and then declare, only after the disputed taxes have been paid, that no such remedy exists.' " *Newsweek, Inc. v. Florida Department of Revenue,* 522 U.S. 442, 444, 118 S.Ct. 904, 139 L.Ed.2d 888 (1998) (quoting from *Reich v. Collins,* 513 U.S. 106, 108, 115 S.Ct. 547, 130 L.Ed.2d 454 (1994)). This, of course, is precisely what KRS 141.200(17) purports to do, and accordingly the Court of Appeals correctly determined that that statute violates the Due Process Clause.

## B. The Due Process Guarantee Is Not Limited To Unconstitutional Taxes.

Against this conclusion, the Cabinet raises two arguments. It contends first that under *McKesson, supra,* the due process guarantee is only implicated by tax statutes ultimately found unconstitutional. While it is true that *McKesson* involved a tax invalidated under the Commerce Clause and thus the Court's discussion is sometimes couched in constitutional terms, the due process principle involved—that a taxpayer may not be deprived of his or her property without a meaningful opportunity to challenge the legality of the deprivation—clearly applies regardless of the ground for challenging the tax, whether federal constitution or, as here, state statute. Indeed *McKesson, supra,* cites earlier United States Supreme Court cases where due process mandated the refund of taxes collected, not in violation of the Constitution, but in violation of federal laws. *See, e.g., Ward v. Bd. of County Comm'rs of Love County, Okl,* 253 U.S. 17, 40 S.Ct. 419, 64 L.Ed. 751 (1920) (taxes assessed in violation of federal treaty). More recently, the Supreme Court itself has noted that *McKesson* "and the long line of cases upon which *McKesson* depends, . . . stand for the proposition that 'a denial by a state court of a recovery of taxes exacted in violation of the laws or Constitution of the United States by compulsion is itself in contravention of the Fourteenth Amendment.' " *Reich,* 513 U.S. at 109, 115 S.Ct. 547. *McKesson,* thus, is not limited to deprivations which violate the U.S. Constitution, nor, indeed, should it be confined to those in violation of federal law. A tax exacted in violation of state law, no less than one in violation of federal law, raises the exact same due process concerns and requires the same meaningful procedural safeguards.

## C. Sovereign Immunity Does Not Trump The Due Process Guarantee.

The Cabinet also contends that KRS 134.580, the refund statute quoted above, effects a waiver of the state's sovereign

immunity and that the General Assembly is free to withdraw that waiver and to reassert the state's immunity at any time and to any extent it deems appropriate. KRS 141.200(17) is merely, the Cabinet argues, a limited reassertion of immunity, which, the Cabinet insists, trumps Appellees' rights under the Due Process Clause.[6] In the case just cited, however, *Reich, supra,* the Supreme Court noted that the Due Process guarantee applies notwithstanding "the sovereign immunity States traditionally enjoy in their own courts." *Id.* at 110, 115 S.Ct. 547. Five years later, in *Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999), the Supreme Court reviewed at length the constitutional and pre-constitutional bases of the states' immunity and held that Congress had no power to require waivers of that immunity. The Court distinguished *Reich,* however, and noted that the state's obligation in that case to provide the tax refund remedy it had held out to its citizens was not subject to sovereign immunity because it was an obligation arising from the Constitution.

In *Reich v. Collins,* we held that, despite its immunity from suit in federal court, a State which holds out what plainly appears to be "a clear and certain" postdeprivation remedy for taxes collected in violation of federal law may not declare, after disputed taxes have been paid in reliance on this remedy, that the remedy does not in fact exist. This case arose in the context of tax-refund litigation, where a State may deprive a taxpayer of all other means of challenging the validity of its tax laws by holding out what appears to be a "clear and certain" post-deprivation remedy. In this context, *due process requires the State to provide the remedy it has promised. The obligation arises from the Constitution itself; Reich* does not speak to the power of Congress to subject States to suits in their own courts.

527 U.S. at 740, 119 S.Ct. 2240 (citations omitted, emphasis supplied). Since *Alden,* several courts have noted that that case specifically preserved *Reich's* promise of a state-court remedy, noting, "The obligation arises from the Constitution itself, . . . ." Thus, where the Constitution requires a particular remedy, such as through the Due Process Clause for the tax monies at issue in *Reich,* or through the Takings Clause as indicated in *First English [Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987)], the state is required to provide that remedy in its own courts, notwithstanding sovereign immunity.

*DLX, Inc. v. Kentucky,* 381 F.3d 511, 528 (6th Cir.2004) (quoting from *Reich* ). See, *e.g. Seven Up Pete Venture v. Schweitzer,* 523 F.3d 948 (9th Cir.2008); *Manning v. Mining and Minerals Division of the Energy, Minerals, and Natural Resources Department,* 140 N.M. 528, 144 P.3d 87 (2006). I agree that this is the import of *Reich* and *Alden,* and conclude, therefore, that KRS 141.200(17) cannot be upheld even if construed as an assertion of the

---

**6.** KRS 141.200(17) makes no mention of immunity, of course, and thus the Cabinet's reading is by no means certain. In 2007, however, the General Assembly amended the refund statute itself by adding provisions "revoke[ing] and withdraw[ing] its consent to suit in any forum whatsoever on any claim for recovery, refund, or credit of any tax overpayment for any taxable year ending before December 31, 1995, made by an amended return or any other method after December 22, 1994, and based on a change from any initially filed separate return or returns to a combined return under the unitary business concept or to a consolidated return." KRS 134.580(9)(a) and (b). Because the General Assembly's invocation of immunity is thus clear enough, it is appropriate to address the Cabinet's immunity argument without belaboring the construction of KRS 141.200(17).

state's sovereign immunity. The Due Process Clause requires a meaningful remedy where taxes have been collected in violation of law and the taxing authority, in this case the Commonwealth, cannot invoke sovereign immunity to relieve itself of that constitutional obligation.

## II. The Taxes At Issue Here May Not Be Imposed Retroactively.

Even if the Due Process Clause requires that invalid taxes be remedied, if the taxes at issue in this case were valid in the first place, then of course Appellees' refund claims would evaporate. KRS 141.200(18) seeks to bring about that very result by validating, in effect imposing, taxes after the fact consistent with the position of RP 41P225. The statute purports to retroactively disavow the "unitary business concept" upon which Appellees' amended returns are based, and thus effectively resurrect RP 41P225, the regulation this Court struck down in *GTE*. The Court of Appeals ruled that while some retroactive tax legislation is allowed, the retroactive reach of KRS 141.200(18), which encompasses tax years some five to twelve[7] years before its July 2000 enactment, exceeds what is allowed under the Due Process Clause. The Cabinet maintains that the Court of Appeals read the Due Process Clause too strictly. I disagree.

## A. The Retroactive Reach Of H.B. 541 Is Unreasonable And So Violates The Due Process Clause.

The Supreme Court addressed the issue of retroactive tax legislation in *United States v. Carlton,* 512 U.S. 26, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994). *Carlton* involved an estate tax provision originally enacted in October 1986 which provided for a deduction when an estate sold stock to an employee stock-ownership plan (ESOP). In December 1986, Carlton, the executor of an estate, used estate funds to purchase stock which he then resold to an ESOP for the express purpose of claiming the estate tax deduction. A week after Carlton filed the estate tax return, the Internal Revenue Service announced that it would seek "clarifying legislation" because the deduction had been intended only for estates where the stock in question was owned by the decedent "immediately before death." Approximately a year after Carlton's stock transactions, Congress amended 26 U.S.C. § 2057 so that it expressly applied only where the decedent had owned the stock at death. The amendment was made retroactive to the date of the original October 1986 enactment. In upholding the amendment the Supreme Court noted that tax legislation is frequently made to apply retroactively to transactions completed earlier in the year of enactment or even in the year prior to enactment. The Court explained that

[t]he due process standard to be applied to tax statutes with retroactive effect, therefore, is the same as that generally applicable to retroactive economic legislation: "Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches.... To be sure, ... retroactive legislation does have to meet a burden not faced by legislation that has only future effects.... The retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the

---

**7.** The Court of Appeals referred to a retroactivity period of five to nine years, presumably because Appellees' refund claims were for tax years 1990–1994. However, KRS 141.200(18) actually stretched back twelve years to the 1988 adoption of RP 41P225.

former'. . . . But that burden is met simply by showing that the retroactive application of the legislation is itself justified by rational legislative purpose."

*Id.* at 30–31, 114 S.Ct. 2018, (quoting from *Pension Benefit Guaranty Corporation v. R.A. Gray & Co.,* 467 U.S. 717, 733, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984)). The 1987 estate tax amendment passed that test, the *Carlton* Court held, because

> [f]irst, Congress' purpose in enacting the amendment was neither illegitimate nor arbitrary. Congress acted to correct what it reasonably viewed as a mistake in the original 1986 provision that would have created a significant and unanticipated revenue loss. There is no plausible contention that Congress acted with an improper motive, as by targeting estate representatives such as Carlton after deliberately inducing them to engage in ESOP transactions. Congress, of course, might have chosen to make up the unanticipated revenue loss through general prospective taxation, but that choice would have burdened equally "innocent" taxpayers. Instead, it decided to prevent the loss by denying the deduction to those who had made purely tax-motivated stock transfers. We cannot say that its decision was unreasonable.
>
> *Second, Congress acted promptly and established only a modest period of retroactivity.* This Court noted in *United States v. Darusmont,* 449 U.S. at 296 [101 S.Ct. 549], that Congress "almost without exception" has given general revenue statutes effective dates prior to the dates of actual enactment. This "customary congressional practice" generally has been "confined to short and limited periods required by the practicalities of producing national legisla-

tion." *Id.* at 296–297 [101 S.Ct. 549]. In *Welch v. Henry,* 305 U.S. 134, 59 S.Ct. 121, 83 L.Ed. 87, [ ] (1938), the Court upheld a Wisconsin income tax adopted in 1935 on dividends received in 1933. The Court stated that the " 'recent transactions' " to which a tax law may be retroactively applied "must be taken to include the receipt of income during the year of the legislative session preceding that of its enactment." *Id.* at 150 [59 S.Ct. 121]. Here, the actual retroactive effect of the 1987 amendment extended for a period only slightly greater than one year. Moreover, the amendment was proposed by the IRS in January 1987 and by Congress in February 1987, within a few months of § 2057's original enactment.

*Id.* at 32–33, 114 S.Ct. 2018 (emphasis supplied). "Recent transactions," then, may be retroactively taxed, provided that the retroactive application of the statute is itself a reasonable means of furthering a legitimate state purpose. Although the *Carlton* Court refrained from defining "recent transactions" beyond noting that they would include transactions "during the year of the legislative session preceding that of [the retroactive statute's] enactment," the Court's discussion indicates that the length of the retroactivity period is an important factor bearing on the reasonableness of the legislation and that a period much in excess of the one upheld in *Welch* (two years) would raise serious due process concerns.

The Cabinet tries to downplay the prompt legislative response and the limited period of retroactivity in *Carlton,* insisting that neither of those factors is part of the due process analysis, an analysis which should focus solely on whether there is a legitimate legislative purpose.[8] Given the

---

8. As the Court of Appeals aptly stated in its opinion in this case: "The Cabinet argues in vain that there is no 'modesty' requirement

under *Carlton*." However, many courts interpreting *Carlton* have found such a requirement, including one case explicitly relied

Commonwealth's delay of over five years in responding to the *GTE* decision and the long retroactive reach of H.B. 541, it is understandable that the Cabinet would want to minimize these aspects. Unfortunately, a fair reading of *Carlton* does not bear out that position. Central to the *Carlton* decision was the recognition that Congress had not disturbed long-standing transactions because, as Justice O'Connor noted in her concurring opinion, "[t]he governmental interest in revising the tax laws must at some point give way to the taxpayer's interest in finality and repose." 512 U.S. at 37–38, 114 S.Ct. 2018.

Here, KRS 141.200(18) offends *Carlton's* timeliness standard in two ways. First, the statute was not passed promptly but rather five and one-half years after *GTE*. Second, it reaches back from its effective date of July 2000 to income received while RP 41P225 was in effect, from September 1988 until December 1994, a retroactivity period from five-and-a-half years to twelve years. I agree with the Court of Appeals that the state's interest in avoiding the

financial consequences of refunds is an inadequate justification for belated legislation with such a long retroactivity period. If the state had *carte blanc* simply to impose retroactive taxes to avoid costly refund claims, then the refund remedy would be rendered uncertain if not entirely meaningless, a result that is clearly unreasonable, and in violation of *Carlton's* due process standard.

The Cabinet offers two cases in support of its position that retroactive tax legislation can reach back for an extended period of time, perhaps indefinitely, and still satisfy due process.[9] Neither case supports the unlimited power which the Cabinet attributes to a taxing authority.

In *Montana Rail Link, Inc. v. United States,* 76 F.3d 991 (9th Cir.1996), a railroad had made tax payments based on the less favorable reading of an ambiguous statute, a provision of the Railroad Retirement Tax Act, which is the functional equivalent of the Social Security Act for railroad employers. In short, the railroad

upon by the Cabinet. *See Tate & Lyle, Inc. v. C.I.R.,* 87 F.3d 99, 107 (3d Cir.1996) ("[t]here [in *Carlton* ], the Supreme Court set forth a two-part test for determining whether the retroactive application of a tax statute violates due process. First, for retroactivity to be upheld, it must be shown that the statute has a rational legislative purpose and is not arbitrary; and second, that the period of retroactivity is moderate, not excessive.")." Opinion at fn. 32.

9. The Cabinet also refers in particular to two cases cited in *Carlton, Milliken v. United States,* 283 U.S. 15, 51 S.Ct. 324, 75 L.Ed. 809 (1931) and *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). Neither of these cases was cited for, or stands for, the proposition that retroactive tax legislation knows no limits. *Milliken* concerned the estate tax of a 1920 decedent's estate. It upheld the application of the 1918 estate-tax rate to a gift in contemplation of death made in 1916. The Court explained that the retroactive application of the 1918

tax-rate increase was a reasonable means of furthering Congress's intent that gifts in contemplation of death be taxed at the same rate as the rest of the decedent's estate. Although the taxpayer did not have notice of the increased rate, this was not a retroactive change apt to upset taxpayer expectations, the Court noted, since estate planners were well aware that gifts in contemplation of death would be taxed at the same rate as the remainder of the estate. The Court did not hold, as the Cabinet suggests, that retroactive taxes are always "reasonable" for due process purposes merely because they serve a State's need for funds. *Usery* was not even a tax case, but a black-lung benefits case, cited in *Carlton* for the proposition that the retroactive aspects of economic legislation must independently satisfy the due process rational basis test. Contrary to the Cabinet's suggestion, it in no way runs contrary to *Carlton's* clear indication that the length of the retroactivity period is a most important factor bearing on the reasonableness of a retroactive tax.

had mistakenly overpaid. The railroad later sought refunds for 1987 and 1988 based on a more favorable reading suggested by the Railroad Retirement Board. In 1989, while the refund claims were pending, Congress amended the RRTA to resolve the ambiguity in favor of the higher tax and made the amendment retroactive so as to apply to the entire period of the statute's ambiguity, from 1983 through 1989. The amendment thus nullified any refund claims based on the ambiguity. The Ninth Circuit held that the retroactive aspect of the amendment satisfied *Carlton*'s rational basis requirement because a shorter retroactive period would have severely decreased the benefits of some retired railroad workers. Significantly, the *Montana Rail* Court distinguished this situation from cases such as *Reich, supra,* where refund claims were based on taxes found to be illegal:

> At no point did MRL [the railroad] pay any tax barred by the Constitution or federal law. The constitutionality and legality of the RRTA is not in dispute, and MRL does not challenge the legitimacy of taxing 401(k) contributions *per se.* MRL erroneously equates its mistaken overpayment of taxes with the government's "unlawful," "improper" and "erroneous" collection of taxes. Contrary to MRL's assertion, the IRS did not violate any federal law by accepting MRL's overpayment. *Seeking a refund for one's own voluntary overpayment of a lawful tax is not the same as pursuing a remedy for payment of an illegal tax.*

*Id.* at 995 (emphasis supplied). *Montana Rail* thus addressed only the retroactive clarification of a valid tax which the taxpayer had voluntarily overpaid through its own misinterpretation of an ambiguous statute. While the Cabinet may find *Montana Rail*'s approval of a clarifying amendment stretching back six years appealing, the Ninth Circuit decision makes clear that it is not addressing the due process issues that arise when a tax has been unlawfully exacted and then retroactive tax laws are passed.

*King v. Campbell County,* 217 S.W.3d 862 (Ky.App.2006) involved KRS 68.197, a statute authorizing counties to collect occupational license fees. Although a 1986 amendment to the statute required counties to give taxpayers a credit for city license fees they had paid, Campbell and Kenton Counties maintained that the amendment did not apply to them. Both had adopted occupational license fees in 1978 when the statute required the issue to be placed on the ballot for voter approval and when counties were permitted, but not required, to give taxpayers credit for their city occupational license fees. Only Campbell and Kenton Counties had passed occupational license fees under this older statutory procedure. The Court of Appeals agreed with the counties' interpretation that the amended statute did not require them to give county taxpayers tax credits for city occupational license fees. However, in *City of Covington v. Kenton County,* 149 S.W.3d 358 (Ky.2004), this Court decided that the amendment did apply to Kenton (and implicitly Campbell too) and thus exposed the county to potentially devastating refund claims for the withheld credits.[10] Almost immediately, in March 2005, the General Assembly amended KRS 68.197 to clarify that Campbell and Kenton Counties were not subject to the city fee credit. The legislation was made retroactive so as to abrogate the *City of Covington* decision and to nullify

---

**10.** Under the *City of Covington* rationale, Kenton County owed refunds from 2000 forward. Because Campbell County had imposed higher taxes in 1986, that county's refund obligations would have extended back to 1986. *See King,* 217 S.W.3d at 866.

refund claims based upon it. In *King* the Court of Appeals rejected Campbell County taxpayer challenges to the retroactive legislation. The Court found that the General Assembly had acted promptly, consistent with *Carlton,* to further the legitimate legislative purpose of avoiding severe disruption of county finances and, that the unanticipated *City of Covington* decision had not interfered with "settled expectations" on the part of Campbell County taxpayers, who had acquiesced in the counties' interpretation of the ambiguous statute for years.[11]

Unlike the amendment in *Carlton,* however, which withdrew an unambiguous deduction and deliberately undermined reasonable taxpayer reliance, House Bill 400 does not withdraw a provision upon which taxpayers have relied, but seeks to clarify the license fee credit provision in the wake of our Supreme Court's *City of Covington* decision. The Campbell County taxpayers could have sought refunds in 1986, when Campbell County first raised its license fee rates following the 1986 amendment to KRS 68.197. For all these years, however, the taxpayers acquiesced in the County's interpretation of that statute, an interpretation that this Court found reasonable, but the Supreme Court rejected. If there are "settled expectations" in this case, they are the County's, not the taxpayers. The taxpayers' expectations arose only with the Supreme Court's *City of Covington* decision in November 2004, and within a few short months, in March 2005, long before those expectations could be deemed "settled" or "vested," the General Assembly had acted to revise the law and to shield Campbell and Kenton Counties from what it believed could be the devastating consequences

of the Supreme Court's decision. In these circumstances-where the General Assembly has not attempted to withdraw legislation upon which taxpayers have relied in structuring their affairs, but has promptly sought to foreclose refunds as the result of an unanticipated judicial interpretation of a constitutionally valid tax provision—the retroactive provisions of House Bill 400 do not run afoul of the timeliness concerns expressed by the United States Supreme Court in *Carlton.*

217 S.W.3d at 870.

The Cabinet understandably focuses on *King* as an example of judicial validation of retroactive tax legislation stretching back for a period well in excess of the modest periods addressed in *Carlton.* *King* is admittedly more akin to the situation before this Court than the mistaken overpayments in *Montana Rail* but there are crucial differences in King and this case which bear strongly on the due process analysis.

Campbell and Kenton Counties were the taxing authorities in *King* and *City of Covington* but their taxing authority was constrained by state statute. The counties construed the rather ambiguous statute (which significantly was not of their own making) as inapplicable to them and this construction, as noted above, was acquiesced in by county taxpayers for many years. The reasonableness and good faith of that particular construction, which relieved Campbell and Kenton of the obligation to credit county taxpayers for city occupational fees, was underscored by the fact that the Court of Appeals upheld it. When *City of Covington* was decided, as the Court of Appeals noted, it was an "unanticipated judicial interpretation" of a valid tax. In other words, the counties had interpreted the ambiguous statute

---

**11.** The Campbell County taxpayers who filed the *King* case waited until *March 2005* to

challenge that county's interpretation and seek refunds back to *September 1986.*

passed by the General Assembly in a consistent, plausible way but this Court ultimately found that the taxpayers who eventually had begun to question the interpretation and who had brought suit to obtain the credits were, in fact, correct. Within four months of that decision, the General Assembly passed a statute that clarified its "original intention" that the tax credit did *not* apply to "those counties where a license fee has been authorized by a public question approved by the voters." In short, the interpretation consistently followed by Campbell and Kenton Counties had been the legislative intent all along.

This case presents a decidedly different scenario. Here, the Cabinet, with the General Assembly's acquiescence, had long construed KRS 141.120 and 141.200 as allowing combined reporting. Only in 1988, without any change in a settled law, did the Cabinet purport to adopt a different construction. In *GTE* this Court held that the Cabinet was not free to say that the statutes meant one thing one day and then the next day to say that they meant something entirely different. Its original reading of those statutes was reasonable, had not been corrected by the General Assembly, and thus was binding. Clearly *King* did not involve the taxing authority suddenly and unilaterally reinterpreting an unchanged tax law to the taxpayers' detriment. Moreover, while *King* arose from "an unanticipated judicial interpretation," *GTE* could not possibly have been unanticipated. Taxpayers challenged the Cabinet's about-face in RP 41P225 promptly and GTE was a return to the precise reading of the statute that the Cabinet itself had engaged in for sixteen years.

Given the long-standing, consistent interpretation of KRS 141.120 to allow combined reporting, KRS 141.200(18) cannot be deemed merely to abrogate *GTE* and to clarify what the law had always been.

Like the estate tax amendment in *Carlton,* KRS 141.200(18) is an attempt to alter the tax law retroactively, but unlike the amendment in *Carlton* it purports to apply the change not just to recent transactions but to transactions (the receipt of income) in tax years from five years to twelve years earlier. Although I recognize the General Assembly's desire to spare the state's budget from the significant refund claims springing from the Cabinet's unauthorized 1988 rereading of KRS 141.120 and 141.200, I agree with the Court of Appeals that this five-year plus backward reach, particularly on these facts, exceeds what the Supreme Court has indicated is reasonable under the Due Process Clause and thus cannot be upheld. Simply put, difficult economic consequences can never justify disregarding citizens' due process rights.

**B.  *GTE* Was Not Wrongly Decided.**

Finally, if the General Assembly could not retroactively ratify RP 41P225 more than five years after *GTE,* the Cabinet urges this Court to do so itself by revisiting and over-ruling our decision in *GTE.* *GTE* was wrongly decided, the Cabinet insists, because notwithstanding its own sixteen-year policy of permitting combined reports, KRS Chapter 141 in fact precluded such reports at all times, and thus RP 41P225 embodied an accurate construction of the law. The Cabinet's invitation to indulge in such revisionism should be rejected, not simply because of *stare decisis,* but because *GTE* was right.

The Cabinet focuses first on KRS 141.200(1). From before 1966, when the General Assembly adopted UDITPA, until the amendments of 1996, that statute provided that "[e]very corporation doing business in this state, except those exempt from taxation under KRS 141.040, shall make a return stating specifically the

items of income and the items claimed as deductions allowed by this chapter. Corporations that are affiliated must each make a separate return." In that timeframe, the General Assembly had not defined either "affiliated" or "corporations that are affiliated," and without some definition the second sentence is ambiguous. It can mean either "each corporation within an affiliation must file a separate return," or "each corporate affiliation must file a separate return." For years, as noted, the Cabinet had in effect applied the second reading and, understanding "affiliated" to include "unitary" corporations, had permitted combined reports. In *GTE,* we held that the Cabinet's settled reading was not unreasonable and thus could not be abandoned merely to suit its own change of policy. Such a change would need to come from the General Assembly. The Cabinet insists that its prior reading of the statute was not reasonable, and that we erred by holding that it was. This disingenuous argument does not provide a sufficient reason to revisit *GTE.* The fact remains that for sixteen years, with the apparent blessing of the General Assembly, the Cabinet construed KRS 141.200 to permit combined reports. That settled construction cannot be undone by the Cabinet merely because an ambiguous phrase might initially have been read a different way. This Court did not err in *GTE* by so holding.

The Cabinet also contends that statutory uses of the term "corporation," are couched in the singular and thus imply a legislative intent that only separate corporations be taxed. In general, however, statutory singulars are understood as referring as well to plurals. KRS 446.020. As noted above, moreover, combined reporting does not involve disregarding separate corporate entities to produce one comprehensive return but rather is an accounting method by which each corporation in a unitary business accounts for its respective share of the unitary entity's income. *See* Sutton, "Comparison of Group Reporting Methods," *supra.* In conjunction with formulary apportionment, combined reporting allows for determination of that portion of the unitary business's income attributable to the taxing state. *Id.* That the statutes refer to "corporation" in the singular, therefore, does not suggest that combined reports had been ruled out. Indeed, also as noted above, KRS 141.205 expressly required "combined returns" in certain circumstances, a clear indication that the General Assembly did not intend to preclude them.

Nor was combined reporting ruled out by the fact that prior to *GTE* the calculation of taxable income in Kentucky began with gross income as determined for federal tax purposes. Combined reporting merely considers together the duly calculated incomes of unitary corporations. It did not require a calculation of income at odds with the statutory definitions, as clearly indicated, by KRS 141.205's provision for combined reports. Again, then, the Cabinet has not shown that its own reading of the statutes from 1972 until 1988 was unreasonable or contrary to their plain intent, and thus *GTE* correctly held that that reading was not to be cast aside without legislative direction.

### CONCLUSION

In sum, I agree with the Court of Appeals that both KRS 141.200(17) and 141.200(18) violate the Due Process Clause and so may not be enforced. KRS 141.200(17) unlawfully withdraws the remedy the state is obliged to provide for illegally collected taxes, and KRS 141.200(18) retroactively imposes a tax beyond the period the Supreme Court has indicated is reasonable. Accordingly, I would affirm the May 5, 2006 Opinion of the Court of Appeals and so respectfully

dissent from the majority's contrary ruling.

CUNNINGHAM, J., joins.