RENDERED: OCTOBER 31, 2019
TO BE PUBLISHED

# Supreme Court of Kentucky

FINAL

DATE 11/25/19 JMF

2018-SC-000166-MR

KEANTAY HUNTER      APPELLANT

V.
ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE SUSAN SCHULTZ GIBSON, JUDGE
NO. 2012-CR-002739

COMMONWEALTH OF KENTUCKY      APPELLEE

## OPINION OF THE COURT BY JUSTICE KELLER

## AFFIRMING IN PART, VACATING IN PART, AND REMANDING

A Jefferson County jury found Keantay Hunter guilty of murder, assault in the first degree, tampering with physical evidence, fleeing or evading police in the second degree, and possession of a handgun by a minor. He was sentenced to twenty-five (25) years in prison. This appeal followed as a matter of right. *See* Ky. Const. Section 110(2)(b). Having reviewed the arguments of the parties, we affirm the judgment of the Jefferson Circuit Court in part, reverse in part, and remand to the circuit court to enter a judgment in accordance with this opinion.

# I. BACKGROUND

On the morning of July 17, 2012, Jesse Williams and Chardedric Cooper were in Williams's bed in his house in west Louisville. When they fell asleep, no one else was present in the house. Cooper awoke when she heard a loud noise like a firework. She heard another loud noise and felt a sharp pain in her leg. Williams was on the floor and unresponsive. Williams had been shot in the chest and killed. Cooper had been shot in the leg. Shortly thereafter, she called 911.

Sometime between 9:00 and 9:30 that same morning, three Louisville-Metro Police officers were patrolling the area in an unmarked car. They saw 17-year-old Keantay Hunter jogging with his hands in the air as if he were attempting to flag down a nearby car. Hunter had known Williams and Cooper for several years and had spent the night at Williams's home several times. Hunter was shirtless, wearing basketball shorts and flip flops. The officers noticed a heavy object in Hunter's shorts pocket that they believed to be a gun. When the officers exited their car to stop Hunter and yelled "Police!", Hunter ran. The officers gave chase, as did back up officers that had arrived at the scene. The officers yelled at Hunter to stop multiple times, but he continued to run. During the chase, Hunter reached towards his pocket several times as if he were trying to reach into it. For a brief period of time, Hunter was out of eye sight of all officers while in between houses and in backyards. When police officers eventually apprehended Hunter, the pocket that had been holding the heavy object was turned inside out and empty. Despite Hunter's refusal to give

officers his hands, officers eventually handcuffed him, placing him under arrest. They searched his pockets and found a bandana, a condom, and a live .380 round.

The police set up a perimeter and called K-9 units to respond to the scene to search for a gun. Contemporaneously, the officers heard a shots-fired call come out over the radio referencing the shooting of Williams and Cooper. A K-9 officer located a .380 handgun along a fence line in the backyard of a house in the area where officers had lost sight of Hunter. It was not buried, and officers did not need to move anything to see it, but it was located in an area where plants and weeds were overgrown.

Hunter was charged with multiple crimes in relation to the above described events. These charges were initially brought against him in juvenile court. The juvenile court, however, transferred his case to circuit court for Hunter to be tried as an adult pursuant to KRS[1] 635.020(4). He was subsequently indicted by a Jefferson County grand jury on the charges of murder, criminal attempt to murder, assault in the first degree, fleeing or evading police in the first degree, tampering with physical evidence, and possession of a handgun by a minor. At a trial by jury, Hunter was found guilty of murder, assault in the first degree, tampering with physical evidence, fleeing or evading police in the second degree, and possession of a handgun by a minor. Hunter appeals to this Court alleging the following errors: (1) The trial

---

[1] Kentucky Revised Statutes.

3

court erred by not declaring KRS 635.020(4) unconstitutional; (2) The trial court erred by denying Hunter's motion to suppress the gun and live round as fruits of an illegal seizure and search; (3) The jury returned an inconsistent verdict; and (4) The trial court erred in denying Hunter's motions for directed verdict on the tampering with physical evidence and fleeing or evading police charges. We will discuss each of these arguments in turn and provide additional facts as needed.

## II. ANALYSIS

### A. Constitutionality of KRS 635.020(4)

Hunter argues that the trial court erred in failing to find KRS 635.020(4) unconstitutional. KRS 635.020(4) states as follows:

> Any other provision of KRS Chapters 610 to 645 to the contrary notwithstanding, if a child charged with a felony in which a firearm, whether functional or not, was used in the commission of the offense had attained the age of fourteen (14) years at the time of the commission of the alleged offense, he shall be transferred to the Circuit Court for trial as an adult if, following a preliminary hearing, the District Court finds probable cause to believe that the child committed a felony, that a firearm was used in the commission of that felony, and that the child was fourteen (14) years of age or older at the time of the commission of the alleged felony. If convicted in the Circuit Court, he shall be subject to the same penalties as an adult offender, except that until he reaches the age of eighteen (18) years, he shall be confined in a facility or program for juveniles or for youthful offenders, unless the provisions of KRS 635.025 apply or unless he is released pursuant to expiration of sentence or parole, and at age eighteen (18) he shall be returned to the sentencing Circuit Court for proceedings consistent with KRS 640.030(2).

Hunter first argues that KRS 635.020(4) is unconstitutional under *Apprendi v. New Jersey* which held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory

4

maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). Hunter argues that the transfer of a juvenile to circuit court to be tried as an adult increases the penalties the juvenile faces beyond the maximum sentence he would face under the juvenile code, and that transfer is based upon judge-found facts that are never submitted to a jury, in violation of *Apprendi*.

This Court, however, has previously found these arguments to be unpersuasive. In *Caldwell v. Commonwealth* we held that *Apprendi* did not apply to juvenile transfer proceedings. 133 S.W.3d 445, 453 (Ky. 2004), overruled on other grounds by *Hall v. Commonwealth*, 551 S.W.3d 7 (Ky. 2018). We explained,

> A juvenile transfer proceeding does not involve sentencing or a determination of guilt or innocence. The decision to transfer a juvenile to circuit court involves the determination of which system is appropriate for a juvenile defendant. We recognize that a juvenile transferred to circuit court and tried as an adult offender will be exposed to the statutory maximum sentence on the applicable criminal statute, which in most cases will exceed the statutory maximum disposition in the juvenile system.

*Id.* Hunter urges us to revisit this holding in light of the United States Supreme Court's subsequent cases interpreting *Apprendi*, as well as its cases discussing youthful offender sentencing. Having found no persuasive reason to stray from our prior precedent, we decline to do so. Pursuant to *Caldwell*, *Apprendi* does not render KRS 635.020(4) unconstitutional.

Hunter next argues that KRS 635.020(4) violates substantive due process and equal protection rights under both the United States Constitution and the

5

Kentucky Constitution. Substantive due process "is based on the idea that some rights are so fundamental that the government must have an exceedingly important reason to regulate them, if at all, such as the right to free speech or to vote." *Miller v. Johnson Controls, Inc.*, 296 S.W.3d 392, 397 (Ky. 2009). Regarding equal protection rights, unless a more specific provisions of our state constitution applies, "an equal protection analysis requires strict scrutiny of legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Commonwealth v. Howard*, 969 S.W.2d 700, 703 (Ky. 1998) (citing *Massachusetts Bd. Of Retirement v. Murgia*, 427 U.S. 307, 312 (1976)).

This Court has previously addressed all of these same arguments in *Caldwell* when we held explicitly, "KRS 635.020(4) does not violate the equal protection rights of Caldwell under our state or federal constitutions. Juveniles are not members of a suspect class and there is no constitutional right to be treated as a juvenile." 133 S.W.3d at 453. Therefore, we found that

> [t]he statutory classification must then be considered under the rational basis test. Where, as here, the act of the legislature does not contain a suspect classification and does not impinge on a fundamental right, the burden is on the party claiming a violation of equal protection to establish that the statutory distinction is without a rational basis.

*Id.* We then went on to hold:

> There is an obvious legitimate governmental interest in curtailing violent crimes by juveniles and protecting the public from harm. The decision of the legislature to further that interest by transferring certain juveniles to circuit court to be tried as adults

after a finding of probable cause by the district judge is reasonably related to the pursuit of that legitimate goal. There is a rational basis for the statutory classification. It does not violate either the state or federal equal protection clauses. KRS 635.020(4) is constitutional.

*Id.*

Despite *Caldwell,* which is directly on point, Hunter implores this Court to hold that KRS 635.020(4) infringes on multiple fundamental rights and that it fails under even a rational basis test. Hunter cites to two publications by the United States Department of Justice[2] to support his argument that mandatory transfer laws are ineffective and therefore not rational. He also points to United States Supreme Court precedent such as *Miller v. Alabama,* 567 U.S. 460 (2012) for its proposition that judges must consider the unique characteristics of youth in making their dispositional decisions.

Under a rational basis test, "the law must be upheld against an equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Howard,* 969 S.W.2d at 703. The statute is presumed to be constitutional, and the challenger of the statute has the burden to prove it is unconstitutional. *Id.* "So long as the statute's generalization is rationally related to the achievement of a legitimate purpose[,] the statute is constitutional. A state does not violate the equal protection clause merely because the classifications made by the statutes are imperfect." *Id.* at 703-04 (internal citations omitted).

---

[2] *Trying Juveniles as Adults: An Analysis of State Transfer Laws and Reporting* (2011) and *Juvenile Transfer Laws: An Effective Deterrent to Delinquency?* (2010).

In discussing KRS 635.020(4), this Court has previously stated,

> The legislature has recognized the seriousness of juvenile crimes of violence, especially those related to gang activity. The risk to the public from juveniles, who are thought to be less capable of good judgment, using firearms to settle disputes is even more frightening than adults doing so, and is likewise properly controlled by governmental action.

*K.R. v. Commonwealth,* 360 S.W.3d 179, 187 (Ky. 2012). Today we reaffirm our holding in *Caldwell* and again hold that KRS 635.020(4) does not violate either the state or federal constitution.

## B. Seizure of Hunter and Evidence of Gun and Live Round

Hunter next argues that the trial court erred in denying his motion to suppress the gun and live round as fruits of an illegal seizure and search. Our review of a suppression decision is two-fold. First, "[w]e review the trial court's factual findings for clear error, and deem conclusive the trial court's factual findings if supported by substantial evidence. The trial court's application of the law to the facts we review de novo." *Williams v. Commonwealth,* 364 S.W.3d 65, 68 (Ky. 2011).

Hunter argues that as soon as the officers exited their car and ordered him to stop, he was seized. This, however, is counter to the United States Supreme Court's holding in *California v. Hodari D.,* 499 U.S. 621 (1991). The United States Supreme Court in *Hodari* held that in order for a seizure to occur, there must either be physical force or, absent that, submission to the assertion of authority. *Id.* at 626. In other words, "[a] seizure does not occur...if in response to a show of authority, the subject does not yield. In that event, the

seizure occurs only when the police physically subdue the subject." *Taylor v. Commonwealth*, 125 S.W.3d 216, 219-20 (Ky. 2003).

Hunter urges this Court to break from *Hodari* and its previous decision in *Taylor* to find that the Kentucky Constitution provides greater protection than does the United States Constitution. Hunter cites to approximately fifteen (15) other states which have declined to follow *Hodari*, finding that their state constitutions provide greater protection than the Fourth Amendment. The Commonwealth, on the other hand, cites to approximately eleven (11) other states that *have* followed *Hodari*. How other states have dealt with this issue, however, is only marginally relevant to our analysis, as we must examine how our Court has traditionally viewed the protection our constitution provides in relation to that provided by the Fourth Amendment of the United States Constitution.

Hunter notes that this Court has recognized that the original Kentucky Bill of Rights "was borrowed almost verbatim from the Pennsylvania Constitution of 1790." *Commonwealth v. Wasson*, 842 S.W.2d 487, 492 (Ky. 1992) (quoting Ken Gomley & Rhonda G. Hartman, *The Kentucky Bill of Rights, A Bicentennial Celebration*, 80 KY. L.J. 1 (1991)). Hunter argues that because Pennsylvania rejected *Hodari* based on its constitution, and our constitution was modeled after Pennsylvania's, this Court should follow Pennsylvania's lead in rejecting *Hodari*. However, in *Wasson*, we were not analyzing Section 10 of our constitution, as we are today. This Court has held time and again that "Section 10 of the Kentucky Constitution provides no greater protection than

9

does the federal Fourth Amendment." *LaFollette v. Commonwealth*, 915 S.W.2d 747, 748 (Ky. 1996), overruled on other grounds by *Rose v. Commonwealth*, 322 S.W.3d 76 (Ky. 2010); *see also Cobb v. Commonwealth*, 509 S.W.3d 705, 712 (Ky. 2017). We see no reason to ignore that precedent today, and therefore explicitly hold, as we previously did in *Taylor*, that under both the United States Constitution and the Kentucky Constitution, "[a] seizure does not occur…if in response to a show of authority, the subject does not yield. In that event, the seizure occurs only when the police physically subdue the subject." *Taylor*, 125 S.W.3d at 219-20.

Having determined the appropriate legal framework, we must now apply the law to the facts of Hunter's case. It is undisputed that when the police officers exited their car and ordered Hunter to stop, he ran. A chase ensued until Hunter was eventually caught. Following *Hodari*, Hunter was not seized until he was physically apprehended by the police following the chase. "Thus, the police officer's justification for initially attempting to stop [Hunter] is immaterial." *Id.* at 220. The gun that was found along Hunter's flight path, therefore, was admissible, as it was not the fruit of any illegal police conduct, and Hunter's motion to suppress the gun was properly denied by the trial court.

Hunter next argues that the trial court erred by denying his motion to suppress the items, including a live .380 round, found during a search of his pocket following his apprehension. The Commonwealth asserts that the police officers had probable cause to arrest Hunter and that these items were

recovered during a search incident to that arrest. Hunter, on the other hand, argues that he had not yet been arrested when his pocket was searched and that the police did not have probable cause to arrest him at that point in time.

The trial court's pertinent findings of fact in its order denying Hunter's suppression motion include the following:

> Det. William Vogt testified that he was on routine patrol on July 17, 2012 in the area of 28th and Greenwood Streets when he observed the Defendant with his hands in the air, appearing to try to flag down a car. According to the detective, "It looked kind of odd," and the detective was concerned about what the Defendant may have been carrying. The Defendant was wearing lightweight basketball shorts, and it was apparent that there was a heavy object bouncing around in the pocket as the Defendant ran. Detective Vogt testified that the appearance was consistent with a gun in the pocket. As the detective approached the Defendant, the Defendant took off running. The Defendant appeared to try to hold onto the object in his pocket as he ran. Det. Vogt pursued the Defendant both in a car and on foot, as he was joined in the pursuit by other officers. The Defendant ran through yards and between houses. The Defendant was apprehended at 32nd and Kentucky Streets after the foot chase, and his pocket was empty. The Defendant resisted arrest and did not want to give his hands to the officers. No gun was found, and the pocket that had held the object was empty. The Defendant had a 380 round of ammunition in a pocket. At this point, Det. Vogt learned that there had been a shooting in the vicinity of the 2700 block of Grand Avenue near where the detective first saw the Defendant....At the point where the Defendant was finally stopped, the Defendant had fled from the police, possibly ditched a gun, and finally resisted arrest.

The trial court then reached the legal conclusion that "[a]t that point Detective Vogt had probable cause to place the Defendant under arrest." The trial court, however, did not specify for which crime the police had probable cause to arrest Hunter.

Having reviewed the record, we find that the trial court's factual findings were supported by substantial evidence in the testimony of Detective Vogt at

11

the suppression hearing. However, to determine for which crime probable cause was established, we must further review the record to better understand the chronological order of the events in this case.

A thorough review of the entire record reveals that while fleeing from Det. Vogt and the other officers on the scene, Hunter crossed multiple streets. He ran across a railroad crossing. He ran between apartment complex buildings, between houses, and through backyards. The officers pursuing him were on foot and in vehicles, following his path and parallel paths as best as they could. Det. Vogt initially pursued Hunter on foot, then pursued him in another officer's vehicle, and finally continued the pursuit on foot until tackling Hunter. The pursuit traversed several blocks of an urban residential area around 9:20 on a weekday morning. The uniform citation charging Hunter with fleeing or evading police in the first degree also noted that there was heavy traffic in the area during the pursuit. Officers observed Hunter, while running through an empty lot with shrubs and foliage, reaching toward his pocket as if he were going to throw the gun in the foliage while running. However, Hunter looked back and saw the officers had him in their sightline and continued running without discarding the gun. It was not until Hunter was out of the officers' sight that he discarded the gun in an overgrown area in the backyard of a residence.

Det. Vogt tackled Hunter and then struggled with him. The timeline of events after Det. Vogt tackled Hunter becomes less clear, as many officers were on scene and events were unfolding quickly, and in some cases, even

12

simultaneously. We know, however, that Hunter did not cooperate and did not give Det. Vogt his hands in order for them to be placed in handcuffs. Det. Vogt asked Hunter why he ran from the police. Hunter responded that he believed he had a warrant. Det. Vogt conducted a pat down of Hunter, did not feel a gun, and saw that the pocket Det. Vogt believed he had seen the gun in had been turned inside out. Based on his training and experience, Det. Vogt believed that Hunter had gotten rid of whatever was in that pocket. At some point, custody of Hunter was transferred to Officer Taylor who conducted a search of Hunter and found a live .380 round, a condom, and a bandana in Hunter's pocket. Officer Taylor conducted this search both as a search incident to arrest and for officer safety, as he was preparing to put Hunter into his car and he testified that his routine was to search suspects before he placed them in his car.

At some point after tackling Hunter, Det. Vogt requested that a perimeter be established and K-9 units respond to the scene to search for the gun Det. Vogt believed Hunter had discarded during his flight. Although it is unclear exactly when, around the same time that Det. Vogt made these requests another officer informed him that a call had come out over the radio in reference to a shots-fired call on Grand Avenue, close to where Det. Vogt had first observed Hunter. It is unclear from the record exactly who knew about the shots-fired call and when they knew it, in relation to the search of Hunter's pocket.

We must now determine whether the facts as the police knew them to be true at the time they arrested Hunter were enough to establish probable cause for that arrest.

> [T]he probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Probable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules.... [T]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized.

*Williams v. Commonwealth*, 147 S.W.3d 1, 7 (Ky. 2004) (internal citations and quotations omitted). Applying these concepts and relying on the factual findings of the trial court, we find that the police officers had probable cause to believe Hunter had committed the offense of fleeing or evading police in the first degree.

Under KRS 520.095(1)(b)(2), fleeing or evading police in the first degree occurs when a pedestrian, "with the intent to elude or flee, . . . knowingly or wantonly disobeys an order to stop, given by a person recognized to be a peace officer" and, "[b]y fleeing or eluding, the person is the cause of, or creates a substantial risk of, serious physical injury or death to any person or property." Though much of our precedent on this offense focuses on whether enough evidence existed to survive a motion for directed verdict on the charge of first degree fleeing or evading, we ask here only whether the officers involved had probable cause to arrest Hunter for this offense. As noted above, we have

14

previously described probable cause as both "a practical, nontechnical conception" and "a fluid concept." *Williams*, 147 S.W.3d at 7.

Here, the officers approached Hunter and announced that they were police officers. In response, Hunter immediately ran from the officers. Hunter continued to run as the officers chased after him, and he disobeyed their directives to stop and continued running. He crossed multiple streets in a residential area with heavy traffic and also crossed railway tracks. Multiple officers followed this same path on foot, and Det. Vogt followed on foot and then in a vehicle and then on foot again before finally subduing Hunter. Based upon these facts, we conclude that the officers had probable cause to believe that Hunter, a pedestrian, "with the intent to elude or flee, . . . knowingly or wantonly disobey[ed] an order to stop, given by a person recognized to be a peace officer" and, "[b]y fleeing or eluding, [Hunter was] the cause of, or create[d] a substantial risk of, serious physical injury or death to any person or property."

In reaching this conclusion, we acknowledge that the charge of fleeing or evading first degree was ultimately successfully challenged on a motion for directed verdict at the close of the Commonwealth's case-in-chief. The trial court amended the charge to fleeing or evading second degree[3], and the jury

---

[3] Under KRS 520.100(1)(a), "A person is guilty of fleeing or evading police in the second degree when: (a) As a pedestrian, and with intent to elude or flee, the person knowingly or wantonly disobeys a direction to stop, given by a person recognized to be a peace officer who has an articulable reasonable suspicion that a crime has been committed by the person fleeing, and in fleeing or eluding the person is the cause of, or creates a substantial risk of, physical injury to any person."

15

found Hunter guilty of this amended charge. As explained below, the Commonwealth now concedes, and we agree, that the motion for directed verdict should have been granted because there was insufficient evidence *at trial* that Hunter's flight created a substantial risk of serious physical injury or death. In other words, we hold that, based upon the evidence presented *at trial*, a reasonable juror could not find Hunter guilty of this charge beyond a reasonable doubt.

We feel it important to clarify, however, that in considering the lawfulness of Hunter's arrest, we are only asking whether the officers *on the scene* had probable cause to believe that Hunter, by fleeing or evading, created a substantial risk of serious physical injury or death. As noted above, probable cause is a fluid concept that cannot be usefully reduced to a succinct set of legal rules. Instead, we consider "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Williams*, 147 S.W.3d at 7. Here, we hold that a reasonable and prudent police officer would have reason to believe that chasing an armed individual, both on foot and by vehicle, across heavily trafficked streets, through backyards, and across railway tracks creates a substantial risk of serious physical injury. The fact that the evidence presented at trial was insufficient to survive a motion for directed verdict is immaterial. We therefore find that probable cause existed to justify Hunter's arrest for fleeing or evading police in the first degree.

Although the trial court's findings do not specify whether a formal arrest occurred prior to the search of Hunter's pocket, it is "not 'particularly

16

important that the search preceded the arrest' when the police had probable cause to arrest the defendant before the search and 'the formal arrest followed quickly on the heels of the challenged search.'" *Id.* at 9 (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980)). Therefore, the search of Hunter's pocket was lawful as a search incident to arrest, and the trial court did not err in admitting the fruits of that search.

## C. Jury's Verdicts on Attempted Murder and Assault in the First Degree

Hunter next argues that the verdict the jury returned on the attempted murder charge was inconsistent with the verdict it returned on the assault in the first degree charge. Both of these charges were in reference to the victim Chardedric Cooper. The jury found Hunter not guilty of attempted murder but guilty of assault in the first degree. Assault in the first degree, by definition, includes an element of serious physical injury. Therefore, by finding Hunter guilty of assault in the first degree, the jury necessarily found beyond a reasonable doubt that Cooper sustained a serious physical injury. The jury, however, returned a special verdict that the crime of attempted murder did *not* involve serious physical injury. Hunter argues that the jury's special verdict regarding serious physical injury in the context of the charge of attempted murder is inconsistent with its finding of serious physical injury in the context of the charge of assault in the first degree. A detailed discussion of the structure and language of the jury instructions is necessary to determine this matter.

17

The instructions given to the jury were seventeen pages long, with ten pages of instructions followed by seven pages of verdict forms. The first page listed all the charges for which the jury would return a verdict. The second page, titled "INSTRUCTION NO. 1 – MURDER," set out the elements of the crime of murder and instructed the jury to record its verdict on the verdict form at the end of the instructions. The third page was titled "INSTRUCTION NO. 2A – CRIMINAL ATTEMPT TO COMMIT MURDER." It stated, in full:

> You will find the defendant, KEANTAY HUNTER, guilty of Criminal Attempt to Commit Murder, under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

> A. That in this county, on or about 17th date of July, 2012, he shot Chardedric Cooper;
> B. That in so doing, it was his intention to kill Chardedric Cooper;
> AND
> C. That under the circumstances as he believed them to be, the Defendant's actions constituted a substantial step in a course of conduct planned to result in the death of Chardedric Cooper.

> If you find the defendant, KEANTAY HUNTER, guilty under this Instruction, you shall say so by your verdict, to be recorded on the Verdict Form at the end of these instructions. There will be a further proceeding to determine his punishment.

> If you find the defendant guilty under this Instruction, you shall additionally answer the following:

> Do you unanimously find beyond a reasonable doubt that the crime of Criminal Attempt to Commit Murder involved serious physical injury, as defined in Instruction No. 6, to Chardedric Cooper?
> _____ Yes
> _____ No

On this page, there was no place for the jury to indicate whether it found Hunter guilty or not guilty of attempted murder. It was not until the second verdict form – page twelve of the jury instruction packet – that the jury was tasked with making this determination. However, as quoted above, page three *did* require the jury to determine, *if* they found Hunter guilty of criminal attempt to commit murder, whether *that* crime involved serious physical injury. In response to this question, the jury foreperson made a check mark on the line next to "No." On the second verdict form on page twelve, however, the jury foreperson indicated that the jury found Hunter not guilty of criminal attempt to commit murder. Therefore, the jury was not required to answer the question on page three asking whether the crime of criminal attempt to commit murder involved serious physical injury. However, the jury *did* answer the question posed to them on page three, so we must look closely at the wording of that question to determine if it is truly inconsistent with the jury's verdict that Hunter was guilty of assault in the first degree.

The question posed to the jury in Instruction 2A was, "Do you unanimously find beyond a reasonable doubt that the crime of Criminal Attempt to Commit Murder involved serious physical injury, as defined in Instruction No. 6, to Chardedric Cooper?" The jury answered this in the negative. The plain text of that question and the jury's answer to it illustrates simply that the jury did not find that the crime of attempted murder involved serious physical injury. Taken together with the jury's verdict finding Hunter not guilty of attempted murder, the answer to the special verdict question is

19

not surprising. Serious physical injury, or an injury of any kind, was not and could not be involved in a crime that was never committed. The special verdict question does not require the jury to make any determination as to whether serious physical injury was involved in the crime of assault in the first degree. Again, looking closely at the language of the special verdict question, we cannot find the jury's answer to it is inconsistent with its verdict of guilty on the charge of assault in the first degree.

Hunter argues that if this Court does not find the verdicts to be inconsistent, we should find the trial court erred in denying his motion for a directed verdict on the charge of assault in the first degree. We will address this argument next.

### D. Motions for Directed Verdict

Hunter's final arguments to this Court are that the trial court erred in denying his motions for a directed verdict on the charges of assault in the first degree, tampering with physical evidence, and fleeing or evading police. Our directed verdict standard has been firmly established in *Commonwealth v. Benham*:

> On a motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purposes of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony. On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.

20

816 S.W.2d 186, 187 (Ky. 1991).

### a. Assault in the First Degree

Hunter argues that the trial court erred in denying his motion for a directed verdict on the charge of assault in the first degree.

> A person is guilty of assault in the first degree when:
> (a) He intentionally causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument; or
> (b) Under circumstances manifesting extreme indifference to the value of human life he wantonly engages in conduct which creates a grave risk of death to another and thereby causes serious physical injury to another person.

KRS 508.010(1). Hunter argues that the Commonwealth did not produce sufficient evidence of a serious physical injury to allow a reasonable juror to find him guilty of assault in the first degree. "'Serious physical injury' means physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ." KRS 500.080(15). "[M]edical testimony is not an absolute requisite to establish serious physical injury," and a "victim [i]s competent to testify about his own injuries." *Commonwealth v. Hocker*, 865 S.W.2d 323, 325 (Ky. 1993). However, "the requirement of serious physical injury for first-degree assault still sets a fairly strict level of proof." *Swan v. Commonwealth*, 384 S.W.3d 77, 101 (Ky. 2012) (internal citations and quotations omitted).

As a result of the shooting, Cooper went to the emergency room and was admitted to the hospital for a couple of days. Her attending physician testified

21

that she presented with a gunshot wound on the side of her leg and another wound on the back side of her calf. She did not suffer any bone fractures or injuries to her blood vessels. The physician testified that he would have expected some scarring. While he did not have knowledge of any follow-up treatment Cooper received, he testified that he prescribed physical therapy based on the possibility of nerve damage.

Cooper testified during Hunter's trial, which took place approximately five years after the shooting occurred. She testified that it was still "kind of hard for [her] to walk." She further testified that she must lift up her whole left leg to walk and that she has decreased mobility in her left foot. She stated that she still suffers from sharp pains in her left foot.

This Court has previously held that "pain is an 'impairment of health,'" and if that pain "is prolonged, then it is a 'serious physical injury.'" *Parson v. Commonwealth*, 144 S.W.3d 775, 787 (Ky. 2004). In *Parson*, we found that where the victim suffered from headaches, neck pain, decreased range of motion due to muscle spasms, and numbness in her arm nineteen months after the assault there was sufficient evidence for a jury to find "prolonged impairment of health" and therefore "serious physical injury." *Id.* The injuries described by Cooper and her attending physician are akin to those in *Parson*. She testified to sharp pain and decreased mobility approximately five years after the assault. This evidence was sufficient for a reasonable jury to find serious physical injury. Therefore, the trial court did not err in denying Hunter's motion for a directed verdict on assault in the first degree.

22

### b. Tampering with Physical Evidence

Hunter also argues that the trial court erred in denying his motion for a directed verdict on the charge of tampering with physical evidence.

> A person is guilty of tampering with physical evidence when, believing that an official proceeding is pending or may be instituted, he:
> (a) [d]estroys, mutilates, conceals, removes or alters physical evidence which he believes is about to be produced or used in the official proceeding with intent to impair its verity or availability in the official proceeding.

KRS 524.100(1)(a). In this case, the Commonwealth presented evidence that when police officers first saw Hunter, they noticed something heavy in his shorts pocket that they believed to be a gun. Hunter then ran from the police after he was ordered to stop. While running from the police, he ran between houses and through backyards. For a brief time, he managed to get out of the sightline of all of the officers who were chasing him. When he emerged from between houses and was eventually caught, the pocket in which the police officers saw the heavy object was turned inside out and was empty. The police officers set up a perimeter and called in two K-9 units to search for the gun they believed they had seen in Hunter's pocket. During that search, a K-9 officer found a gun. It was found in the backyard of a house in the area where officers had lost sight of Hunter, off to the side of the yard along a fence line. It was not buried, and the officers did not need to move anything to recover it, but it was found in an area with overgrown weeds and bushes.

In *Williams v. Commonwealth*, we found sufficient evidence of tampering with physical evidence where the defendant "flung the gun into a field of

23

weeds," despite no evidence that he buried the gun or otherwise camouflaged it. 486 S.W.3d 291, 298 (Ky. 2016). Hunter's case is similar to *Williams.* Viewing the evidence in the light most favorable to the Commonwealth, sufficient evidence was presented to induce a reasonable juror to find Hunter guilty of tampering with physical evidence, as Hunter discarded the gun in an overgrown area along a fence line while outside of the sightline of police officers, requiring a K-9 officer to find it.[4] As such, the trial court did not err in denying his motion for a directed verdict on that charge.

### c. Fleeing or Evading Police

At the close of the Commonwealth's case-in-chief, the trial court granted Hunter's motion for a directed verdict on the charge of fleeing or evading police in the first degree, amending the charge to fleeing or evading police in the second degree. The jury found Hunter guilty of this amended charge. In their briefs to this Court, both parties agree that the trial court erred in finding sufficient evidence was presented to submit this amended charge to the jury. Insufficient evidence was presented that Hunter's flight "create[d] a substantial risk of[] physical injury to any person." KRS 520.095. Accordingly, we vacate

---

[4] In a case also rendered today, *Commonwealth v. James*, this Court adopted an interpretation of our tampering statute that applies to a narrow set of circumstances: "where a defendant merely drops, throws down, or abandons drugs in the vicinity of the defendant and in the presence and view of the police, this conduct does not constitute' tampering by either concealment or removal that will support an evidence-tampering charge." 2017-SC-000576, 2018-SC-000066, 1, 18-19 (Ky. Oct. 31, 2019). The facts of Hunter's case do not fit within this new rule, as Hunter did not discard the gun "in the presence and view of the police."

Hunter's fleeing or evading police in the second degree conviction and remand this case to the trial court to enter a judgment in conformity with this opinion.

### III. CONCLUSION

For the foregoing reasons, we affirm Keantay Hunter's convictions for murder, assault in the first degree, tampering with physical evidence, and possession of a handgun by a minor. We vacate Hunter's conviction for fleeing or evading police in the second degree. We remand this case to the trial court to enter a judgment in conformity with this opinion.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Kathleen Kallaher Schmidt
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Emily Lucas
Assistant Attorney General

William Robert Long, Jr.
Assistant Attorney General

Jason Bradley Moore
Assistant Attorney General